**Elias HERNANDEZ, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**Nos. 01–00–00303–CR-01–00–00305–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 2, 2001.

Michael B. Charlton, Houston, for Appellant.

Michael J. Guarino, Crim. Dist. Attorney-Galveston County, B. Warren Goodson, Jr., Asst. Dist. Atty., Galveston, for State.

Panel consists of Justices MIRABAL, JENNINGS, and DUGGAN.*

## OPINION

JENNINGS, Justice.

Appellant, Elias Hernandez, pleaded not guilty to three indictments alleging three separate acts of aggravated sexual assault of the same female child under 14 years of age. All three cases proceeded to trial together before the same jury. The jury found appellant guilty and sentenced him in each case to 18 years confinement. Appellant brings two points of error, contending the trial court erred (1) in allowing expert testimony in violation of Texas Rule of Evidence 702, and (2) in refusing to admit into evidence a videotaped recording. We affirm.

■ We overrule appellant's second point of error because a review of the record reveals the videotape in question was never offered into evidence. Without a formal offer and adverse ruling, nothing was preserved for review. TEX.R.APP. P. 33.1.

Appellant's first point of error requires a thorough review and analysis of the facts of this case and the applicable case law.

### Facts and Procedural Background

In September 1997, appellant was accused by his seven-year-old niece of sexual abuse. After a Children's Protective Services (CPS) investigation, the above criminal charges were brought against appellant.

During the guilt-innocence phase of the trial, the State presented, as its final witness, Trudy Davis, Executive Director of the Advocacy Center for Children in Galveston County, a non-profit organization that works with governmental agencies to evaluate child abuse cases. After describing the physical facilities and the role and function of the Advocacy Center, Davis testified to her background and duties. She has three years experience as the Executive Director of the Advocacy Center and holds a bachelor's degree in criminal justice and sociology. She was a case worker and supervisor at Galveston County CPS for 18 years and an investigator for the Galveston County District Attorney's office for two years. Davis's career

---

* The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

has focused on the abuse and neglect of children, primarily in the area of sexual abuse, and she has worked on thousands of cases involving the sexual abuse of children. She has testified as an expert on many occasions and is well versed in the "dynamics and common characteristics of a sexually abused child."

After Davis testified that all sexually abused children do not react the same way, appellant's counsel requested and was allowed to take Davis on voir dire in front of the jury. Appellant's voir dire provided a more detailed picture of Davis's qualifications. Voir dire revealed that 12 of her 18 years at CPS were dedicated to sexual abuse cases and that she was a supervisor for 11 of those years. The jury learned that Davis conducted and supervised investigations, videotaped interviews of abused children, and received training in sexual abuse at various workshops and conferences.

Apparently relying on *Kelly v. State*, 824 S.W.2d 568, 575 (Tex.Crim.App.1992), appellant's counsel then asked a series of questions regarding factors concerning the reliability of Davis's "opinion" on "sexual abuse." The testimony showed Davis (1) had not conducted any studies, (2) had not published any articles, (3) understood her data and opinions were recognized by the general community of psychology and psychiatry, (4) did not know the potential rate of error of her opinion, and (5) believed her opinion was reliable, as it was based on "experience and observation and training." Appellant's counsel further questioned Davis:

[DEFENSE]: How would you test your theories?

[DAVIS]: I don't think there's really a test except by taking other professionals who have done studies and had practices related to sexual abuse and relate that to what we're seeing when we are involved in a sexual abuse case

in terms of looking for dynamics and characteristics that are common.

. . . .

[DEFENSE]: Your comments do not impact whether or not a child tells the truth when it [sic] testifies; is that correct?

[DAVIS]: What I'm saying is that the opinions are not going to focus on a specific child's testimony as to credibility or not. But, in general, children's credibility and how they disclose, how they become involved in sexual abuse, and how—what occurs after disclosure. That's what I'm referring to in general, not a specific.

After establishing Davis had not met the victim in this case nor reviewed the video of this victim, appellant's counsel made the following objection:

Your Honor, I would move to strike any testimony as an expert because I don't believe that she's met all the qualifications under the Texas Rules of Evidence 702, 703, and, in particular, *Daubert*.

After confirming the State would not solicit an opinion as to "this particular child['s]" credibility, the trial court overruled appellant's objection and permitted Davis to testify.

The State proceeded to ask Davis about "Child Abuse Accommodation Syndrome." She stated there are "common characteristics and dynamics" observed in child sexual abuse cases, including "[s]ecrecy, helplessness, entrapment or accommodation, delayed or conflicted disclosure, and recantation. . . ." Davis then explained under question and answer each of these characteristics to the jury. Essentially, she related to the jury the great extent of the manipulation of sexually abused children. She discussed the trust the victim has in the perpetrator and the enormous amount of strain on child sexual abuse victims, which may lead to delayed disclosures and false recantations:

They feel a tremendous amount of guilt and responsibility for the relationship going on. They feel humiliated because they haven't been able to tell. So, they're just going to tell you a little bit and then tell you more as time goes on, seeing that you are listening and not condemning them in any way. [A]fter they disclose and see the response to their disclosure, they say it didn't happen; I dreamed it; I made it up.... The family is in turmoil. It rips their family apart and, again, they want their family to be together. They feel responsible for that. They would rather say it didn't happen and go back to the way things were.

### Expert Witness Testimony

In his first point of error, appellant contends the trial court erred in allowing Davis to testify as an expert on "Child Abuse Accommodation Syndrome" based on our holding in *Perez v. State*, 25 S.W.3d 830 (Tex.App.—Houston [1st Dist.] 2000, no pet.). This case brings before this Court, once again, the consequences and results of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its Texas progeny, *E.I. du Pont de Nemours and Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995), and *Jordan v. State*, 928 S.W.2d 550 (Tex.Crim.App.1996), which held the inquiry of expert witness reliability addressed in *Kelly* is substantively identical to the inquiry stated in *Daubert*.

### *The Objection*

We first address appellant's objection to the testimony of Davis on the grounds she did not meet the "qualifications of the Texas Rules of Evidence 702, 703, and, in particular, *Daubert*." Appellant's objection was made after counsel's voir dire of Davis using questions patterned from the *Kelly* reliability factors. He also structures his appellate argument on these reliability factors.

■ To preserve error, an objection to the admission of evidence must state the specific ground for the objection if the specific ground is not apparent from the context. Tex.R. Evid. 103(a); Tex.R.App. P. 33.1; *Bird v. State*, 692 S.W.2d 65, 70 (Tex.Crim.App.1985). For example, an objection to an improper predicate that fails to inform the trial court exactly how the predicate is deficient will not preserve error. *Bird*, 692 S.W.2d at 70.

The Texarkana Court of Appeals has twice held that objections similar to appellant's objection in this case are not specific enough to preserve error. In *Chisum v. State*, 988 S.W.2d 244, 250–51 (Tex.App.—Texarkana 1998, pet. ref'd), defense counsel objected to the admission of an expert's opinions, but did not specify any particular deficiency in the expert's qualifications or the reliability of her opinions. Thus, the court held no error was preserved for review. *Chisum*, 988 S.W.2d at 251. Similarly, in *Scherl v. State*, 7 S.W.3d 650, 652 (Tex.App.—Texarkana 1999, pet. ref'd), defense counsel objected to admission of intoxilyzer evidence because it was inadmissible "under Rule 702, *Daubert*, *Kelly*, and *Hartman*." The court noted Rule 702 and these cases cover numerous requirements and guidelines for the admission of expert testimony and held the objection did not adequately inform the trial court of a specific complaint upon which to rule. *Scherl*, 7 S.W.3d at 652.

■ Appellant's objection to Davis's testimony on the grounds that she did not meet the "qualifications of the Texas Rules of Evidence 702, 703, and, in particular, *Daubert*" is a general objection. However, given the context of the voir dire questioning, appellant was clearly attacking the reliability of Davis's opinions based on her not performing any studies, not publishing any articles, and not knowing the potential

rate of error of her opinion. Thus, the objection adequately informed the trial court of the complaint upon which to rule. *See* TEX.R. EVID. 103(a); TEX.R.APP. P. 33.1; *Bird,* 692 S.W.2d at 70.

Due to the confusion, apparent from the arguments made before the trial court and in the briefs, regarding the standard of reliability applicable to the expert opinion in this case and the general confusion surrounding *Daubert* and its Texas progeny, a review of the pertinent case law is in order.

### Pre–Daubert: Duckett v. State

Prior to *Daubert,* the Texas Court of Criminal Appeals held in *Duckett v. State,* 797 S.W.2d 906, 915–917 (Tex.Crim.App. 1990), that expert testimony which provided a jury with information concerning "Child Sexual Abuse Syndrome" and which applied elements of the syndrome to the facts of the case was admissible.

In *Duckett,* the State called John Brogden, a social worker and clinical practitioner who held a certificate as an instructor with the Texas Commission on Law Enforcement Officer's Standards and Education in the area of child sexual abuse investigation. 797 S.W.2d at 908. Brogden testified that children who are sexually abused almost always go through certain phases over the period of time of abuse and in its aftermath. After discussing each phase or "element," Brogden then applied the abstract elements to the particulars of the case. *Id.* Element by element, and over objection, the State was allowed to question Brogden in general terms and then solicit his opinion on how each element was manifested by specific facts in the instant case. He was not asked and did not volunteer an opinion whether the complainant was, in fact, telling the truth. He did explain why children, in general, would act in a manner consistent with

actions of the complainant. The court noted that Brogden was describing the phenomenon known as the "Child Sexual Abuse Syndrome." *Duckett,* 797 S.W.2d at 915.

In its pre-*Daubert* analysis, the Court of Criminal Appeals ruled that the decision whether to allow an expert to testify was committed to the sound discretion of the trial court, and it focused on a relatively simple, strict interpretation of Texas Rule of Evidence 702:

> Expert testimony, to be admissible, must pass the threshold test that it concern a subject upon which the aid of an expert opinion will be of assistance to the trier of fact. . . . The real question in admitting expert testimony is whether that testimony will assist the jury in reaching a just verdict in the case. Many times the jury may be aided by background information which might tend to explain certain behavior and without which the jury may be "left in the dark." Where such testimony is highly specialized or technical in nature, so as to be outside the knowledge of the average layman, a threshhold determination of admissibility under Rule 702 is both proper and consistent with prior case law of this State.

*Duckett,* 797 S.W.2d at 911 (citations omitted). The Court additionally noted:

> The accommodation syndrome has a place in the courtroom. The syndrome helps explain why many sexually abused children recant allegations of abuse and deny that anything occurred. If use of the syndrome is confined to these rehabilitative functions, the confusion clears, and the accommodation syndrome serves a useful forensic function.

*Id.* at 913 (*quoting* Meyers et al., *Expert Testimony in Child Sexual Abuse Litigation,* 68 NEB. L.REV. 1, 68 (1989)).[1] The

---

1. In *Cohn v. State,* 849 S.W.2d 817, 818 (Tex. Crim.App.1993), the appellant challenged as

court held that, because the evidence was of such a specialized nature not normally within the common understanding of a lay jury and helped to explain why the victim's behavior was not bizarre or illogical under the circumstances in comparison with behaviors of known abused children, the evidence "was of a type which could have assisted the trier of fact in determining the fact questions raised by the conflicting testimony of the complainant and her mother." *Id.* at 916. In regard to "Child Sexual Abuse Syndrome," the court specifically noted:

> [I]t cannot be said that each of us *understands* all facets of the problem, including why a child who has been abused will act in a certain manner which to the layman may appear unreasonable or inconsistent with a claim of abuse. Brogden's information was both relevant and admissible under the rules of evidence, because it was specialized information of value in assisting the jury to understand the evidence regarding the complainant's conduct.

*Id.* at 920. This interpretation of Rule 702 was, of course, pre-*Daubert* and its "reliability" requirement.

### Daubert, Robinson, and Jordan

The United States Supreme Court granted certiorari in *Daubert* to determine whether the rule of *Frye v. United States*, 293 F. 1013 (1923), remained good law after the enactment of the Federal Rules of Evidence. *Daubert*, 509 U.S. at 586–87, 113 S.Ct. at 2793. The Court concluded the *Frye* rule was no longer valid, and the majority opinion offered some "general observations." *Id.* at 593, 113 S.Ct. at 2796. These "general observations" set new standards for the admissibility of expert testimony.[2] The Court held that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but *reliable*."[3] *Id.* at 589, 113 S.Ct. at 2795 (emphasis added). Although "not presum[ing] to set out a definitive checklist or test," in considering the admissibility of expert scientific testimony, the Court offered the following as a "flexible" inquiry to be made by the trial judge:

---

"bolstering" the admissibility of similar expert testimony where the child complainants were not impeached. The court held that the expert testimony from a psychiatrist regarding certain behaviors of the children was "circumstantial evidence that the children did experience *some* traumatic event" consistent with sexual abuse, and was admissible as relevant evidence. *Cohn*, 849 S.W.2d at 819. The court resolved any ambiguity in *Duckett*, which seemed to require a rehabilitative function, by holding such evidence was not "bolstering." *Id.* at 819–20.

2. In his dissent, Chief Justice William Rehnquist warned:

> "General observations" by this Court customarily carry great weight with lower federal courts, but the ones offered here suffer from the flaw common to most such observations—they are not applied to deciding whether particular testimony was or was not admissible, and therefore they tend to be not only general, but vague and abstract.

*Daubert*, 509 U.S. at 598, 113 S.Ct. at 2799 (Rehnquist, C.J., concurring in part and dissenting in part).

3. Critical of the majority's "parsing the language" of Federal Rule of Evidence 702 requiring "reliability" based upon scientific validity, the Chief Justice prophetically noted:

> Questions arise simply from reading this part of the Court's opinion, and countless more questions will surely arise when hundreds of district judges try to apply its teaching to particular offers of expert testimony.... I do not doubt that Rule 702 confides to the judge some gatekeeping responsibility in deciding questions of the admissibility of proffered expert testimony. But I do not think it imposes on them either the obligation or the authority to become amateur scientists in order to perform that role.

*Daubert*, 509 U.S. at 599–601, 113 S.Ct. at 2800.

(1) whether the theory or technique "can be (and has been) tested";

(2) whether the theory or technique "has been subjected to peer review and publication";

(3) what is "the known or potential rate of error" for any tests or techniques; and

(4) whether there is " 'general acceptance' " in the relevant scientific community.

*Id.* at 593–94, 113 S.Ct. at 2796–97 (citations omitted).

Emphasizing the importance of trial judges "scrutiniz[ing] proffered evidence for scientific reliability when it is based upon novel scientific theories, sometimes referred to as 'junk science'," the Texas Supreme Court adopted the *Daubert* analysis.[4] *Robinson,* 923 S.W.2d at 554.

After previously requiring a *Daubert*-esque analysis in *Kelly*,[5] the Texas Court of Criminal Appeals embraced *Daubert* in reversing and remanding a trial court decision excluding the testimony of an expert on eyewitness identification. *Jordan,* 928 S.W.2d at 555–56. The court pointed to its previous requirement that, to be considered reliable, scientific theory evidence must satisfy three specific criteria:

(1) the underlying scientific theory must be valid;

(2) the technique applying the theory must be valid; and

(3) the technique must have been properly applied on the occasion in question.

*Id.* at 554 n. 5 (citing *Kelly,* 824 S.W.2d at 573). The court cited its "list of *nonexclu-*

*sive factors* that could affect a trial court's determination of reliability":

(1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained;

(2) the qualifications of the expert(s) testifying;

(3) the existence of literature supporting or rejecting the underlying scientific theory and technique;

(4) the potential rate of error of the technique;

(5) the availability of other experts to test and evaluate the technique;

(6) the clarity with which the underlying scientific theory and technique can be explained to the court; and

(7) the experience and skill of the person(s) who applied the technique on the occasion in question.

*Id.* at 554 & n. 6 (citing *Kelly,* 824 S.W.2d at 573) (emphasis added). This inquiry is "substantively identical to the inquiry mandated by the Supreme Court ... in *Daubert* ...." *Nenno v. State,* 970 S.W.2d 549, 560 (Tex.Crim.App.1998), *overruled on other grounds by State v. Terrazas* 4 S.W.3d 720, 727 (Tex.Crim.App.1999).

### Nenno v. State

The defendant in *Nenno* contended the trial court erred in admitting expert testimony in the punishment stage of trial from Kenneth Lanning, a Special Agent in the Behavioral Science Unit of the FBI who specialized in studying the sexual victimization of children, regarding the defendant's future dangerousness. 970 S.W.2d

---

4. In a dissent, Justice Cornyn noted, "The rule adopted by the Court is unworkable because it requires judges to venture upon a determination that the foundation for an expert witness's opinion is 'scientifically reliable.' " *Robinson,* 923 S.W.2d at 560 (Cornyn, J., dissenting).

5. Although *Kelly* involved novel scientific evidence, the court later concluded that the standard established in that case applied to all scientific evidence, whether or not it was novel. *Hartman v. State,* 946 S.W.2d 60, 62–63 (Tex.Crim.App.1997).

at 562. He argued that Lanning's testimony was inadmissible under (1) Texas Rule of Evidence 702 because it failed to meet the *Kelly* test, and (2) Texas Rule of Evidence 403 because it merely duplicated the jury's knowledge and carried the prospect of unduly influencing the jury with an "expert" label. *Id* at 560.

The Court of Criminal Appeals extended its holdings in *Kelly* and *Jordan* to apply to such *"nonscientific* expert testimony (i.e. that involving technical or other specialized knowledge)." *Id.* However, the court emphasized the application is *"qualified,"* and pointed out that while "[t]he general principles announced in *Kelly* (and *Daubert*) apply, ... the specific factors outlined in those cases *may or may not apply depending upon the context." Id.* (emphasis added).

The court reminded us that the *Daubert* inquiry is "flexible," and pointed out that there is a general agreement in federal circuits about two important propositions: (1) the gatekeeping function of trial judges regarding the reliability of expert evidence applies to all forms of expert testimony; and (2) the *Daubert* factors *"do not necessarily apply outside the hard science context." Id.* at 561 (emphasis added). The court emphasized that "methods of proving reliability will vary, depending upon the field of expertise" and recognized:

> When addressing fields of study aside from the hard sciences, such as the social sciences or fields that are based primarily upon *experience and training* as opposed to the scientific method, *Kelly* 's requirement of reliability applies but with less rigor than to the hard sciences. To speak of the validity of a "theory" or "technique" in these fields may be roughly accurate but somewhat misleading.

*Id.* (emphasis added).

Acknowledging that "hard science methods of validation, such as assessing the potential rate of error or subjecting a theory to peer review, may often be inappropriate for testing the reliability of fields of expertise outside the hard sciences," the Court offered "an appropriately tailored translation of the *Kelly* test to areas outside of hard science," with the pertinent questions being:

(1) whether the field of expertise is a legitimate one;

(2) whether the subject matter of the expert's testimony is within the scope of that field; and

(3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field.

*Id.*

Applying this test to Lanning's testimony, the Court noted that his analysis was based upon "his experience studying cases," he did not contend he had a particular methodology for determining future dangerousness, and research concerning the behavior of offenders who sexually victimize children appeared to be a legitimate field of expertise. *Nenno,* 970 S.W.2d at 562. The court also recognized that a person may acquire "superior knowledge concerning the behavior of such offenders" through "interviews, case studies, and statistical research" and that Lanning had studied in excess of a thousand cases concerning the issue of future dangerousness. Lanning's research included personally interviewing inmates convicted of child sex offenses, reviewing their psychological records, and examining the facts of the offenses involved. *Id.*

Although the defendant complained about the lack of peer review, the court pointed out, "the absence of peer review does not necessarily undercut the reliability of the testimony presented here," and "[t]o the extent that a factfinder could decide that the absence of peer review cast doubt on the credibility of the testimony,

such affects the weight of the evidence rather than its admissibility." *Id.* The court held the reliability of Lanning's testimony was sufficiently established under Rule 702; it did not merely duplicate the jury's knowledge because he possessed superior knowledge concerning the behavior of offenders who sexually victimized children. *Id.*

The Texas Supreme Court followed similar reasoning in concluding that nonscientific expert testimony must meet the reliability standards required in *Daubert/Robinson,* but recognized the specific *Daubert/Robinson* factors for assessing the reliability of scientific evidence "cannot always be used with other kinds of expert testimony." *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726 (Tex.1998). The Court stressed:

> [T]here must be some basis for the opinion offered to show its reliability. *Experience alone may provide a sufficient basis for an expert's testimony in some cases, but it cannot do so in every case.* A more experienced expert may offer unreliable opinions, and a lesser experienced expert's opinions may have solid footing. *The court in discharging its duty as gatekeeper must determine how the reliability of particular testimony is to be assessed.*

*Id.* (emphasis added).

### Standard of Review

We, as an appellate court, will not disturb a trial court's determination that a witness is or is not qualified as an expert unless a clear abuse of discretion is shown. *Morales v. State,* 32 S.W.3d 862, 865 (Tex.Crim.App.2000); *Gammill,* 972 S.W.2d at 718–19; *Perez,* 25 S.W.3d at 832. A reviewing court cannot conclude that a trial court abused its discretion if, in the same circumstances, it would have ruled differently or if the trial court committed a mere error in judgment. *Robinson,* 923 S.W.2d at 558. The test is not whether the facts present an appropriate case for the trial court's action in the opinion of the reviewing court. We will gauge an abuse of discretion by whether the trial court acted without reference to any guiding rules or principles. *Id.* Thus, a trial court enjoys wide latitude in determining whether expert testimony is admissible. Judge Harvey Brown, *Procedural Issues Under Daubert,* 36 Hous. L.Rev. 1133, 1159 (1999).

### Analysis

In this case, the trial court's decision to overrule appellant's objection and allow the testimony of Davis was not an abuse of discretion. Her testimony would have been admissible under the pre-*Daubert* construction of Rule 702, as illustrated by *Duckett,* and is admissible as "reliable" under the current standards enunciated in *Nenno.*

Davis's qualifications and experience are at least equal to those of the expert who testified about "Child Sexual Abuse Syndrome" in *Duckett.* The depth of her professional career—three years experience as the Executive Director of the Advocacy Center, 18 years experience at Galveston County's CPS working on "thousands" of cases involving the sexual abuse of children, and her personal experience in conducting and supervising investigations—qualifies her to explain the dynamics and common characteristics of a sexually abused child.

However, under *Daubert* and its Texas progeny, gauging the reliability of expert evidence requires further analysis. Because the evidence offered by Davis was actually nonscientific expert testimony, we are mindful that the *Daubert* factors "do not necessarily apply outside of the hard science context." *Nenno,* 970 S.W.2d at 561. We, therefore, turn to the *Nenno* translation of the *Kelly* test, applicable to

areas outside of hard science, and consider:

(1) whether Davis's field of expertise is a legitimate one;

(2) whether "Child Abuse Accommodation Syndrome" is within the scope of Davis's field of expertise; and

(3) whether her testimony properly relied upon or utilized the principles involved in her field.

*See id.* at 561.

Davis's field of expertise is certainly legitimate, as recognized by the Court of Criminal Appeals in *Duckett,* and, as with the expert who testified in *Nenno,* Davis's opinions regarding the characteristics and dynamics of sexually abused children were based on her extensive experience observing children in thousands of cases. Due to her superior knowledge concerning the behavior of children who have suffered sexual abuse, "Child Abuse Accommodation Syndrome" and the common characteristics and dynamics of sexually abused children are matters within the scope of her expertise. Also, Davis's unimpeached testimony elicited on voir dire underscored the fact that her data and opinions were recognized by the general community of psychology and psychiatry, demonstrating the proper reliance on accepted principles in her field.

Although there must be some basis demonstrating that an expert's opinion is reliable, the Texas Supreme Court has recognized that "[e] *xperience alone* may provide a sufficient basis for an expert's testimony...." *Gammill,* 972 S.W.2d at 726 (emphasis added). Because of Davis's extensive experience with child sexual assault victims and because Child Abuse Accommodation Syndrome and the common characteristics and dynamics of sexually abused children are within the scope of her expertise, we hold these factors alone sufficiently demonstrate the reliability of her expert testimony. Thus, the trial court did not abuse its discretion in allowing Davis's testimony.

Appellant contends this case is "controlled" by our holding in *Perez* because we "addressed the same witness testifying to the same facts." Although the same trial court in *Perez* was reversed for allowing the expert testimony of Davis, appellant's reliance on *Perez* is misplaced. *Perez* is not on point because the subject of Davis's testimony in *Perez* was not the same as in this case. The holding in *Perez* was limited to Davis's testimony about a psychiatrist's theories of pediatric psychiatry and did not address the admissibility of her *own* opinions based on her *own* experiences as an expert. *Perez,* 25 S.W.3d at 838 & n. 2 ("The testimony about Dr. Summit's theory was error.... We express no opinion regarding Davis's qualifications to testify as an expert regarding her own observations and opinions, without reference to the opinions, observations, and theories of Dr. Summit."). In *Perez,* we applied the more detailed *Kelly* inquiry concerning the reliability of scientific, not nonscientific, expert testimony because the testimony in question concerned a psychiatrist's theories on pediatric psychiatry. *Id.* at 836–38.

We overrule appellant's first point of error.

### Conclusion

From their inception, *Daubert* and its Texas progeny have been roundly criticized as (1) reflecting a distrust of jurors, (2) placing judges in gatekeeping roles for which they are ill-equipped, (3) increasing the cost of litigation, and (4) resulting in less justice. Brown, 36 HOUS. L.REV. at 1170–85. We are mindful of Chief Justice Rehnquist's and Justice Cornyn's prescient dissents anticipating *Daubert* and *Robinson* problems at the trial court level. We note, however, that trial court judges,

functioning in their role as gatekeepers, admitting reliable expert testimony and excluding unreliable expert testimony, have wide latitude.

■■■ *Daubert* problems arise and criticisms seem justified when the suggested inquiries are too rigidly applied. The United States Supreme Court, the Texas Supreme Court, and the Texas Court of Criminal Appeals have repeatedly emphasized that the pertinent suggested inquiries are to be used flexibly and are not exclusive. *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2797; *Robinson,* 923 S.W.2d at 557; *Nenno,* 970 S.W.2d at 561. A trial court may consider other factors, not listed, that are germane to an expert's qualifications and field of expertise in determining the reliability of the proffered evidence. Again, the "methods of proving reliability will vary, depending upon the field of expertise." *Nenno,* 970 S.W.2d at 561. A trial court, "in discharging its duty as gatekeeper must determine how the reliability of particular testimony is to be assessed." *Gammill,* 972 S.W.2d at 726.

■ Trial courts must take this gatekeeping responsibility seriously, and we will not substitute our judgment for that of the trial court. We will respect the discretion of trial court judges in performing their gatekeeping function and will not disturb their rulings on the reliability of expert testimony unless it appears from the record they acted without reference to the pertinent guiding rules or principles. *See Robinson,* 923 S.W.2d at 558.

We affirm the judgment.