Chester Alan Sanchez v. State

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-03-320-CR

CHESTER ALAN SANCHEZ APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 30TH DISTRICT COURT OF WICHITA COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I.  Introduction

Appellant Chester Alan Sanchez appeals his conviction for capital murder. A jury found Sanchez guilty, and the court assessed his punishment at life imprisonment.  In three points, Sanchez challenges the admission of rebuttal testimony given by Dr. Fredrick Mears and the admission of his videotaped confession.  We will affirm.

II.  Procedural Background

During questioning in connection with the death of Willie B. Anderson, Sanchez confessed on videotape that he intended to kill Anderson during the course of a robbery.  After being indicted for capital murder, Sanchez filed a written motion to suppress any recorded conversation he had with law enforcement officers and a 
Jackson v. Denno
(footnote: 2) motion to determine the admissibility of his confession.  The trial court conducted a 
Jackson v. Denno
 hearing and determined that Sanchez’s confession was voluntarily made.  During the trial, the jury watched the videotaped confession and listened to expert testimony regarding Sanchez’s level of intellectual functioning, which the trial court admitted solely for the purpose of assisting the jury in determining the voluntariness of Sanchez’s confession.  Thereafter, the jury found Sanchez guilty of capital murder. 

III.  Dr. Mears’s Testimony Was Properly Admitted

In its case-in-chief, the defense called Dr. Leon Morris.  He had given Sanchez several intelligence tests, which, in his opinion, showed that Sanchez was functioning at the sixth percentile for people his age.  Dr. Morris testified that Sanchez is not mentally retarded and that his scores were consistent with borderline intellectual functioning.
(footnote: 3)  At the conclusion of Dr. Morris’s testimony, the trial court told the jury that Dr. Morris’s testimony regarding Sanchez’s level of intellectual functioning was admitted “solely for the purpose of assisting [the jury], if it does, in determining the voluntariness of [Sanchez’s] statement given to Officer Rutledge.”

Afterwards, the defense called Sanchez to give his version of the events surrounding the robbery and death of Anderson.  During his testimony, Sanchez admitted that he stated during his videotaped confession that he had  intended to kill Anderson.  However, he testified that his videotaped statement was not true and that he “just told [the police] what they wanted to hear.” 

Thereafter, the State called Dr. Mears to rebut Dr. Morris’s testimony regarding Sanchez’s level of intellectual functioning.  Dr. Mears had reviewed Sanchez’s scores from previous intelligence testing, as well as his school records, performed a standard mental status examination, and interviewed Sanchez.  Dr. Mears disagreed that Sanchez was in the sixth percentile with regard to his ability to give a voluntary confession.  Instead, he concluded that Sanchez’s adaptive functioning was excellent, stating that Sanchez “had the intellectual abilities and adaptive and social intelligence to do quite well and think well on his feet and talk well and communicate with other people.”  Dr. Mears further stated that Sanchez’s score in adaptive functioning was higher than the scores of some college students.  At the conclusion of Dr. Mears’s
 testimony, the trial court told the jury that Dr. Mears’s testimony “regarding [Sanchez’s] level of intellectual functioning, social intelligence, and/or adaptive functioning was admitted . . . solely for the purpose of assisting [the jury], if it does, in determining the voluntariness of [Sanchez’s] statement given to Officer Rutledge.”

A. Testimony Regarding Level of Intellectual Functioning Was Proper

In his first point, Sanchez argues that the trial court abused its discretion in admitting Dr. Mears’s rebuttal testimony because his testimony concerning Sanchez’s level of intellectual functioning was unreliable and unsupported by proper methodology.

The test for admitting expert testimony is set forth in rule 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

Tex. R. Evid.
 702.  The burden of establishing a witness’s qualifications lies with the party offering the testimony.  
Matson v. State
, 819 S.W.2d 839, 851 (Tex. Crim. App. 1991).  No rigid formula exists for determining whether a particular witness is qualified to testify as an expert.  
Id.
 at 851 n.10.  The special knowledge qualifying a witness as an expert may be gleaned entirely from studying technical works, obtaining a specialized education, practical experience, or a combination of the three.  
Holloway v. State
, 613 S.W.2d 497, 501 (Tex. Crim. App. 1981).  Consequently, the question of whether a witness offered as an expert possesses the required qualifications rests largely in the trial court’s discretion.  
Wyatt v. State
, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000); 
see also
 
Tex. R. Evid.
 702.  Absent an abuse of discretion, the trial court’s decision to admit or exclude testimony will not be disturbed.  
Wyatt
, 23 S.W.3d at 27.

Here, the State established that Dr. Mears, based on his education and professional training, was fully qualified to render expert testimony on Sanchez’s mental capabilities.
(footnote: 4)  
See Perez v. State
, 113 S.W.3d 819, 834 (Tex. App.—Austin 2003, pet. ref’d) (recognizing that “[e]xperience alone may provide a sufficient basis for an expert’s testimony”).  However, under 
Daubert
(footnote: 5) and its Texas progeny, gauging the reliability of expert evidence requires further analysis. 
Hernandez v. State
, 53 S.W.3d 742, 750 (Tex. App.—Houston [1st Dist.] 2001, pet. ref’d).  Because the evidence offered by Dr. Mears related to social science or a field that is based primarily on experience and training as opposed to the scientific method, we are mindful that the 
Daubert
 factors “do not necessarily apply outside of the hard science context.”  
Nenno v. State
, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998), 
overruled on other grounds by
, 
State v. Terrazas
, 4 S.W.3d 720, 272 (Tex. Crim. App. 1999).  Instead, the appropriate inquiry involves the following questions:  (1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert’s testimony is within the scope of that field, and (3) whether the expert’s testimony properly relies upon and/or utilizes the principles involved in the field.  
Id.

Dr. Mears’s field of expertise, psychology, is certainly legitimate as recognized by the Texas Court of Criminal Appeals’ approval of psychological expert testimony.  
See Tiede v. State
, 76 S.W.3d 13, 13-14 (Tex. Crim. App. 2002) (psychological expert provided testimony during punishment stage of trial on clinical disorders involving dissociation and was prepared to give testimony on “sudden passion,” appellant’s future dangerousness, and appellant’s behavior after offense); 
Griffith v. State
, 983 S.W.2d 282, 288 (Tex. Crim. App. 1998) (FBI agent, who was formerly a psychologist at maximum security prison, was allowed to testify about appellant’s future dangerousness),
 cert. denied
, 528 U.S. 826 (1999).  Because of Dr. Mears’s training, experience, and superior knowledge concerning the mental competency of criminals, the question of whether Sanchez had borderline intellectual functioning is clearly a matter within the scope of Dr. Mears’s expertise.  
See Hernandez
, 53 S.W.3d at 751 (stating that “Child Abuse Accommodation Syndrome” and common characteristics of sexually abused children were matters within scope of expert’s expertise where expert had superior knowledge concerning behavior of children who had suffered sexual abuse); 
see also Nenno
, 970 S.W.2d at 562 (stating that through interviews, case studies, and statistical research, person may acquire, as result of such experience, superior knowledge concerning behavior of sexual offenders).  Furthermore, Dr. Mears’s testimony during voir dire underscored the fact that the procedures he used to evaluate Sanchez were procedures “that psychologists throughout American [sic] would accept when it comes to an IQ.”
(footnote: 6)  Consequently, Dr. Mears’s expert opinion—which relied upon his review of Sanchez’s intelligence test scores and school records, his analysis of Sanchez’s performance on a standard mental status examination, and his interview with Sanchez—properly relied upon and utilized principles involved in the field.  
See Hernandez
, 53 S.W.3d at 751 (stating that expert’s unimpeached testimony during voir dire underscored fact that her data and opinions were recognized by general community of psychology and psychiatry, demonstrating proper reliance on accepted principles in her field).

Because Dr. Mears was qualified to give expert testimony and his testimony met the 
Nenno
 factors, the trial court did not abuse its discretion in admitting his rebuttal testimony.  
See id.
; 
cf. Nenno
, 970 S.W.2d at 562 (stating that to the extent factfinder could decide that absence of peer review cast doubt on credibility of testimony, such affects weight of evidence rather than admissibility).  We overrule Sanchez’s first point.

B. Sixth Amendment Right to Counsel Was Not Violated by Dr. Mears’s Examination and Testimony 

In his second point, Sanchez claims that the trial court abused its discretion and erred in admitting the rebuttal testimony of Dr. Mears because Dr. Mears’s testimony concerning Sanchez’s statements was obtained in violation of his Sixth Amendment right to counsel. 
 A thorough review of the record reveals that Dr. Mears did not give testimony concerning any statement made by Sanchez; instead, Dr. Mears limited his testimony to his opinion regarding Sanchez’s level of intellectual functioning.  Consequently, it appears that Sanchez’s second point should be overruled.

Nonetheless, giving a liberal construction to Sanchez’s second point,
(footnote: 7) he complains generally that the psychiatric examination performed by Dr. Mears violated his Sixth Amendment right to counsel. 
 After thoroughly reviewing the record, we are unable to locate an objection to Dr. Mears’s testimony stating that his examination violated Sanchez’s Sixth Amendment right to counsel. Instead, the record reflects that Sanchez objected to the admissibility of Dr. Mears’s testimony based on lack of notice regarding Dr. Mears’s psychiatric examination of Sanchez.  Because Sanchez’s objection at trial does not comport with his complaint on appeal, nothing is preserved for review.  
See Turner v. State
, 805 S.W.2d 423, 431 (Tex. Crim. App.), 
cert. denied
, 502 U.S. 870 (1991).  We overrule Sanchez’s second point.

IV.  Sanchez’s Confession Was Voluntary

In his third point, Sanchez contends that the trial court erred in overruling his motion to suppress the videotaped confession and admitting the confession into evidence because the confession was not given after a voluntary, knowing, and intelligent waiver of his rights.  Specifically, Sanchez complains that no valid waiver appears on the videotape, that the police used coercive interrogation tactics, and that he did not have the mental acumen to make a voluntary confession.  The State responds that Sanchez’s level of intellectual functioning, coupled with his experience with the criminal justice system,
(footnote: 8) leads to the conclusion that the trial court did not err in finding the confession voluntary.

We review a trial court’s ruling on a motion to suppress evidence under a bifurcated standard of review.  
Carmouche v. State
, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); 
Guzman v. State
, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  In reviewing the trial court’s decision, we do not engage in our own factual review.  
Romero v. State
, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); 
Best v. State
, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.).  At a suppression hearing, the trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. 
State v. Ross
, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).
  
Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor.  
Johnson v. State
, 68 S.W.3d 644, 652-53 (Tex. Crim. App. 2002); 
Best
, 118 S.W.3d at 861-62.  However, we review de novo a trial court’s rulings on mixed questions of law and fact if they do not turn on the credibility and demeanor of witnesses.  
Johnson
, 68 S.W.3d at 652-53.

In determining whether the trial court’s decision is supported by the record, we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than evidence introduced later.  
Rachal v. State
, 917 S.W.2d 799, 809 (Tex. Crim. App.), 
cert. denied
, 519 U.S. 1043 (1996); 
Green v. State
, 78 S.W.3d 604, 608 (Tex. App.—Fort Worth 2002, no pet.).
  Nevertheless, this general rule is inapplicable where the suppression issue is consensually relitigated by the parties during the trial on the merits. 
 Rachal
, 917 S.W.2d at 809;
 
Green
, 78 S.W.3d at 608.  Where the State raises the issue at trial, either without objection or with subsequent participation in the inquiry by the defense, the defendant has made an election to re-open the evidence, and consideration of the relevant trial testimony is appropriate in our review.  
Rachal
, 917 S.W.2d at 809.

In the instant case, during trial, the trial court granted Sanchez a running objection to the evidence at issue during the suppression hearing; therefore, we would normally limit our scope of review to the evidence presented at the suppression hearing.  
See James v. State
, 102 S.W.3d 162, 170 (Tex. App.—Fort Worth 2003, pet. ref’d).  However, Sanchez secured a charge instruction regarding the voluntariness of his confession, telling the jury

that unless you believe from the evidence beyond a reasonable doubt that the statement or confession of Chester Alan Sanchez introduced into evidence was freely and voluntarily given by Chester Alan Sanchez without improper influence including but not limited to your consideration of all relevant factors such as any deception or misrepresentation by the police, intelligence of the defendant, any questioning of the defendant over a prolonged period of time without allowing him to contact his wife, attorney, or any other family member or the consideration of any other improper compulsion or improper persuasion, or if you have a reasonable doubt thereof, then you shall wholly disregard the statement or confession and not consider such statement or confession for any purpose nor any of the evidence obtained as a result thereof, including the videotape played to you during the course of this trial.

Therefore, we review the entire record, not just the record made at the suppression hearing, to determine whether the confession was voluntary.  
Licon v. State
, 99 S.W.3d 918, 922 (Tex. App.—El Paso 2003, no pet.).

The statement of an accused may be used in evidence against him if it appears that it was freely and voluntarily made without compulsion or persuasion.  
Wyatt
, 23 S.W.3d at 23; 
see also
 
Tex. Code Crim. Proc. Ann.
 art. 38.21 (Vernon 1979).  The mere fact that a defendant is uneducated and illiterate does not mean that he does not understand the nature of the rights he is waiving and cannot voluntarily give a confession.  
Peacock v. State
, 819 S.W.2d 233, 235 (Tex. App.—Austin 1991, no pet.).  “The determination of whether a confession is voluntary is based on an examination of the totality of circumstances surrounding its acquisition.”  
Wyatt
, 23 S.W.3d at 23; 
Penry v. State
, 903 S.W.2d 715, 744 (Tex. Crim. App.), 
cert. denied
, 516 U.S. 977 (1995).

The trial court made the following written findings with regard to Sanchez’s July 14, 2001 videotaped statement:

1. The statement was the result of a custodial interrogation of the Defendant by members of the Wichita Falls Police Department;

2. An electronic recording, namely a video tape, was made of the statement;

3. Prior to making the statement, the Defendant received the warnings set out in Article 38.22, Section 2, of the Code of Criminal Procedure’ [sic] initially by Justice of the Peace, Mike Little and subsequently by Officer William Rutledge of the Wichita Falls Police Department;

4. The warnings given by Judge Little are audible on the video tape although the Defendant and Judge [L]ittle were “off camera”;

5. The warnings given by Officer Rutledge appear both audibly and visually on the video tape and prior to the actual statement;

6. The Defendant indicated that he understood Officer Rutledge’s warnings and that he wished to waive the rights set out in the warnings by his execution, on the video tape, of a written warning sheet which was admitted into evidence at the hearing as State’s Exhibit 6;

7. The video tape equipment that was used was capable of making an accurate recording of the Defendant’s statement;

8. The operator of the equipment was competent in operating the equipment;

9. The video taped recording is accurate and there is no evidence that the video tape has been altered;

10. All voices on the video tape are identified either directly or by observing the persons on the video tape as they speak; and, 

11. Counsel for the Defendant was given a proper copy of the video taped statement in a timely fashion as required by Article 38.22, Section 3(5) of the Code of Criminal Procedure.

Based on the trial court’s written findings, Sanchez’s argument that no express waiver appears on the videotape lacks merit.  Even had the videotape not contained an express waiver of his rights, his argument would still fail because the law does not require that the recording reflect an express waiver of rights.  
See Rocha v. State
, 16 S.W.3d 1, 12 (Tex. Crim. App. 2000); 
Etheridge v. State
, 903 S.W.2d 1, 16 (Tex. Crim. App. 1994), 
cert. denied
, 516 U.S. 920 (1995).

With regard to the interrogation tactics used by the police, Sanchez complains (1) that he was interrogated over two days for prolonged periods of time,
(footnote: 9) (2) that he was kept from his wife and family, (3) that the police denied him the right to call his wife, (4) that the police lied to him about fingerprints on Anderson’s wallet, (5) that the police lied to him about three witnesses who would testify that Sanchez had admitted killing Anderson, (6) that the police admitted that they attempted to “intimidate” him, and (7) that the police threatened to charge his wife with a crime if he failed to cooperate.  Sanchez’s first three arguments fail to persuade us that his confession was involuntary because the officer who took Sanchez’s statement testified that the interrogation lasted only twenty minutes; thus, any deprivation he claims lasted only momentarily.  Sanchez’s contentions that the police lied to him and that they admitted that they attempted to intimidate him are insufficient, under the totality of circumstances presented here, to render his otherwise voluntary confession inadmissible.  
See Green v. State
, 934 S.W.2d 92, 99 (Tex. Crim. App. 1996) (stating that misrepresentations made by police to suspect during interrogation are a relevant factor in assessing whether confession was voluntary, but are insufficient to render an otherwise voluntary confession inadmissible),
 cert. denied
, 520 U.S. 1200 (1997).  Moreover, the mere fact that the police may have used trickery or deception by threatening to charge Sanchez’s wife with a crime if he failed to cooperate also does not make his statement involuntary unless the method used was calculated to produce an untruthful confession or was offensive to due process.  
See Creager v. State
, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997).  Here, the record as a whole does not demonstrate that Sanchez’s confession became involuntary because of the tactics used by the police.

Sanchez further contends that his age
(footnote: 10) and his borderline intellectual functioning prevented him from being able to freely and voluntarily confess to killing Anderson.  Our review of the record, as discussed above with Sanchez’s first point, shows that Sanchez was mentally capable of making a knowing, intelligent, and voluntary waiver of his constitutional rights.  
See Green
, 934 S.W.2d at 100-01 (holding confession voluntary where appellant, who had prior experience in criminal justice system, was eighteen when he made confession, and his records showed that he was of average intelligence).

Because the trial court is the sole judge of the credibility of the witnesses and the weight of their testimony, we hold that the trial court’s findings and conclusions are supported by the record.  
See Wyatt
, 23 S.W.3d at 25. Viewing the totality of the circumstances, we hold that the trial court did not abuse its discretion in finding Sanchez’s confession to be freely and voluntarily made.  
See id.
; 
Walker v. State
, 842 S.W.2d 301, 303 (Tex. App.—Tyler 1992, no pet.).  We overrule Sanchez’s third point.

V.  Conclusion

Having overruled each of Sanchez’s three points, we affirm the trial court’s judgment.

SUE WALKER

JUSTICE

PANEL A: CAYCE, C.J.; WALKER and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P. 
47.2(b)

DELIVERED: August 5, 2004

FOOTNOTES
1:
See 
Tex. R. App. P
. 47.4.

2:
378 U.S. 368, 84 S. Ct. 1774 (1964).

3:
On cross-examination, Dr. Morris admitted that Sanchez revealed during his interview that he had installed a transmission in his truck, could change engines in other vehicles, was able to use public transportation and telephone directories, handled his own finances, participated in hobbies like fishing and hunting, and visited friends approximately three times a week.  

4:
The record demonstrated that Dr. Mears, a professor of psychology at the University of Texas at Tyler, had a Bachelor of Science degree in psychology, a Master’s of Science degree in psychology, a Ph.D. in educational research and measurement and psychometry, a Ph.D. in neuropsychology, and a psychopharmacology degree.  He completed a school psychology internship. Dr. Mears was a licensed psychologist and a board-certified neurophysiologist. He ran his own private practice, which involved evaluating criminal defendants for the State and performing evaluations of their mental state or mental competency.

5:
Daubert v. Merrell Dow Pharm., Inc.
, 509 U.S. 579, 113 S. Ct. 2786 (1993).

6:
Dr. Mears explained that he could not give Sanchez the same intelligence tests that Dr. Morris gave Sanchez because ideally one would wait a considerable time before regiving the tests.  Moreover, Dr. Mears stated that, in his opinion, “it could be a very major disadvantage to [Sanchez] to regive the test.”

7:
See
 
Tex. R. App. P.
 38.9; 
see also Bee v. State
, 974 S.W.2d 184, 186-87 (Tex. App.—San Antonio 1998, no pet.) (describing the practice of construing points of error liberally in order to adjudicate justly, fairly, and equitably rights of litigants).

8:
As a juvenile, Sanchez was convicted of theft of a habitation.

9:
We note that the police interrogated Sanchez when he was not in custody on July 13, 2001, and he gave three video statements at that time. However, those statements do not contain the confession at issue here. Therefore, we focus our analysis solely on the July 14, 2001 confession.

10:
Sanchez was nineteen at the time he gave his confession.