**1349-15**

ORIGINAL

PD-_____

IN THE
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS

RECEIVED IN
COURT OF CRIMINAL APPEALS

DEC 04 2015

Abel Acosta, Clerk

# TIMOTHY WAYNE FISHER
## VS
# THE STATE OF TEXAS

APPEAL Nº. 01-14-00400-CR
TRIAL Nº. 1379925

FILED IN
COURT OF CRIMINAL APPEALS

DEC 04 2015

Abel Acosta, Clerk

# PETITION FOR DISCRETIONARY REVIEW

SUBMITTED BY:

Timothy Wayne Fisher
Petitioner Pro se
TDCJ - No. 1928112
James V. Allred Unit
2101 FM 369 NORTH
Iowa Park, TX 76367

# Identity of Parties + Counsel

**Presiding Judge**
Hon. Jan Krocker
184 Dist. Court
1201 Franklin, 17th FL.
Houston, TX 77002

Court of Appeals
first Dist. of Texas
Houston

**Prosecution**
Lauren Byrne
Karlie Davis
Assistant Dist. Atn.s
Harris County, Texas
1201 Franklin, Suite 600
Houston, TX 77002-1930

**Appellee**
Carly Dessauer
Assist. Dist. Atten.
Harris County, TX
1201 Franklin, Suite 600
Houston, TX 77502

**Defense Counsel**
Clyde Williams
P.O. Box 230246
Houston, TX 77223-0246

**Appellant Counsel**
Mark C. Kratovil
Asst. Pub. Def.
1201 Franklin 13 Fl.
Houston, TX 77002

# TABLE OF CONTENTS

**PROCEEDINGS:**                                                                                          **PAGE:**

INDEX OF AUTHORITIES ........................................ II.

OYER (Tex.R.App.Proc., Rule 68.; 2...) .................. 1

STATEMENT REGARDING ORAL ARGUMENT ......... 2

STATEMENT OF THE CASE ............................... 2

STATEMENT OF PROCEDURAL HISTORY ............ 3

GROUND FOR REVIEW:

Ground One -

Did the Court of Appeals error - ruling their "We
need not decide whether the trial court erred
in admitting Dr. Donaruma to testify on issue
objected to by the defense? ........................ 4

STANDARD ON REVIEW ___                                                              4

SUMMARY OF ARGUMENT                                                              4

ARGUMENT ___                                                                             5

CONCLUSION ___                                                                          7

PRAYER                                                                                     8

VERIFICATION                                                                             9

CERTIFICATE OF SERVICE                                                            10

# Index Of Authorities

CASES                                                                    PAGES

Burns v. State, 298 S.W.3d 697 (App. 4 Dist. 2009)                        5,7

Celis v. State, 354 S.W.3d 7 (App. 13 Dist. 2011)                          5

Ex parte Henderson, 384 S.W.3d 833, 860-61 (Tex. Crim. App.)              7

Fisher v. State, 235 S.W.3d 470 (App. 4 Dist. 2007)                        5

Lagrone v. State, 942 S.W.2d 602, 616 (Tex. Crim. App. 1997)             4

Weatherred v. State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000)           4,7


Constitutional

Civ. Prac. + Rem., Code § 132.001.-3 et. seq./ 28 U.S.C. § 1746          9


Rules And Statutes

Tex. R. App. Proc. 2.                                                       1

Tex. R. App. Proc. 9.3 (b)                                                 1

Tex. R. App. Proc. 33.1 (a)                                                7

Tex. R. App. Proc. 66.3 (f)                                                2

Tex. R. App. Proc. 67.                                                      1

Tex. R. App. Proc. 68.                                                      1


Tex. Code Criminal Procedure Art. 44.2                                    9


Tex. Penal Code § 22.04 (a)(1), (e)                                        2

PD-_____

TIMOTHY WAYNE FISHER § IN THE

VS. § COURT OF CREMINAL APPEALS

THE STATE OF TEXAS § AUSTIN, TEXAS

## PETITION FOR DISCRETIONARY REVIEW

To the Justices Of The High Court,

Comes Now Petitioner /Pro se Timothy Wayne Fisher. And in accordance with Texas Rules of Appellate Procedures Rule 68., Petitions this High Court for Discretionary Review. Fisher Further request the Court to suspend Rule 9.3 (b), requiring the party to file not only the Original Petition, but eleven (11) more copies. As this Petitioner is currently incarcerated with no access to a copier. (See: Rule 2., Tex. R. App. Proc.)

And as reason to grant a Review, on His Petition under Rule 68, OR, on the Court's own initiative under Rule 67 (Tex. R. App. Pro.) Fisher prays the Court would consider "whether a court of appeals has so far departed from the accepted and usual course of judicial proceedings or so far sanctioned such a departure by

1

a lower court, as to call for an ~~exp~~ exercise of the Court of Criminal Appeals' power of supervision. (See: Rule 66.3(f) R.A.P.)

## Statement Regarding Oral Argument
The petition should speak for itself.

## Statement Of The Case

Timothy Wayne Fisher was indicted of the felony offence of Intentionally and Knowingly causing serious bodily injury to a Child. (CR56) In trial Cause No. 1379925, the jury finds Him guilty of the lesser-included offense, Reckless Injury to a Child. (See: Texas Penal Code Ann., §22.04(a)(1),(e).) - Vernon Supp. 2014). And after a finding of true to one previous felony conviction, (see: CR 56 paragraph __) the jury recommands a Ninety (90) year Sentence In the Texas Department of Criminal Justice - Correctional Institutional Division AND, a $10,000 fine. (CR 632, 638: 15RR 143, 145).

A timely Notice of Appeal ensued. (CR 641, 643). However NO other post-trial Motions were filed.

## STATEMENT OF PROCEDUAL HISTORY

On Appeal, Cause No. 01-14-00400-CR, Fisher raised a "Sole Issue". "The trial court erred in allowing Dr. Marcella Donaruma to testify as to her opinion re — garding the timing of the complaining witness's injuries, the amount of force that had to have been used to injure the complainant, and whether the complainant's injuries were caused by Intentionally or accidentally, as Dr. Donaruma reached these conclusions by depending on an unrealiable methodology."

(Quoting: Brief for Appellant, p. 24).

TO WHICH, In its Opinion issued August 25th, 2015, the 1st District Court of Appeals Held: "We need not decide whether the trial court erred in admitting Dr. Donaruma's testimony on the Issues because even were we to conclude that the trial Court erred in admitting the evidence....". (relief may not be granted unless "the admission of unreliable testimony was harmful".) (see: pp. 22-23)

Accordingly, "We hold that any error of the trial court in admitting the complained-of portions of Donaruma's expert testimony was harmless." (see: pp. 28-29).

THEREBY, "We affirm the judgement of the Trial Court as Modified." (See: "Conclusion", p. 31). No Motion for Rehearing was filed.

## GROUND ONE

Did the Court of Appeals error – ruling that "We need not decide whether the trial court erred in admitting Dr. Donaruma to testify on issues objected to by the defense?"

## STANDARD ON REVIEW

On Appeal [Art. 44.02 CCP], the admission of expert testimony is reviewed for abuse of discretion. [Lagrone v State, 942 S.W. 2d 602, 616 (Tex. Crim. App. 1997)]. WHEREBY, the trial court's ruling is considered in light of the evidence presented at the time of its ruling, and must be affirmed if the ruling lies within the zone of 'reasonable disagreement'. (Emphasis 'Added') [Weatherred v State, 15 S.W. 3d 540, 542 (Tex. Crim. App. 2000)].

## SUMMARY OF ARGUMENT

On Discretionary Review, Petitioner pro se argues that record evidence reveals a potential of a Nonconstitutional error may in fact affected his substantial right (Due Process), that trial court's ruling was outside the zone of 'reasonable disagreement in light of evidence which the defendant objected to. There by, the Court of Appeals erred not ruling on the issues presented in the Brief for Appellant. And Affirming his conviction.

4

## ARGUMENT AND AUTHORITY

Generally, if the trial court's ruling merely offends the Rules of Evidence, the erroneous admission or exclusion is a Non-constitutional error for purposes of harmless error analysis. [Celis v State, 354 S.W. 3d 7 (App. 13 Dist. 2011)]. HOWEVER, a non-constitutional error that affects a substantial right, will not be discarded on appeal when the error has substantial and injurious effects or influence on a jury's verdict. [Fisher v State, 235 S.W. 3d 470 (App. 4 Dist. 2007)].

In determining whether a non constitutional error affected a defendant's substantial rights... (the) reviewing court should consider: (1) whether the State emphasized the error; (2) whether the erroneously admitted evidence was cumulative; and, (3) whether it was elicited from an expert. [Burns v State, 298 S.W. 3d 697 (App. 4 Dist. 2009)].

In regards to whether the State emphasized the error:

1. Dr. Donaruma formulated a "rough" time frame (twelve (12)-hour window) in which she believed J.F. sustained his injuries, which the State intended to introduce before the jury. (8 RR 123) [see: State's Appellate Brief, p.18, para 3.]

2. In its closing argument to the jury, the State declares, "this time frame (12 hours) puts Josiah solely in the care and custody of the Appellant at the time of injury. (12 RR 68-70).

3. Reinforcing its case against Fisher, with this time frame by restating Donaruma conclusion Lex is too young to have

5

exerted the amount of force necessary to had harmed Josiah. (12 RR 68) [See Brief for Appellant, p. 42, para 2] ;

2. In regards to whether erroneously admitted evidence was cumulative of other evidence: The Court of appeals rested its affirmation on a generalized finding, "Other witnesses, without objection from appellant, proffered the same or substantially similar opinion ... about the timing of the complainant's injuries ...." [See Memorandum Opinion, p. 28-29, para 2]. HOWEVER, after complete review of the record, the only two references to the estimated time of injury, reveals their only substantialism is their differences. Including their method used to reach a conclusion. (a) We have Dr. Donaruma's "rough" no more than 12 hours conclusion from above. (b) Is Dr. Hochhauser's "3 to 36" hours. (10 RR 86, 96) ; and,

3. In regards to whether erroneously admitted evidence was elicited from an Expert: (a) Donaruma was the States' "Lone Star" Expert. Infact Donaruma is a frequent expert witness for the State. Having testified on more than fifty (50) occasions. In explaining why she has never testified in court for the defense, she opined "They don't like what I say." (8 RR 184-185). AND, (b) the trial court overruled the defense's objections to Dr. Donaruma's testimony and oral finding at the close of the Kelly/Daubert hearing stating I specifically —

6

find the witness is qualified. I specifically find that her opinion has a basis in science. And I specifically find that the underlying data may come in, that this is not more prejudicial than probative. And, therefore, it will be allowed. (8 RR 133-134) [See Brief for Appellant, p. 26, para 2].

In Conclusion, Fisher believes the foregoing evidence does prove the prospect of a Non Constitutional error may in fact affected the defendents substantial rights. Burns Supra.

And that the trial court's rulings ... at the time of its ruling — lies just outside the zone of 'reasonable disagreement." Weatherred supra.

Furthermore, because the trial court held a hearing litigating the objections lodged by the defense and made a ruling specifically stating the trial court's ultimate ruling and findings on the record, this point of error was in fact preserved for appellate review. Tex. R. App. Proc. 33.1(a).

Thus the Court of appeals erred ruling — We need not decide whether the trial court erred in admitting Dr. Donaruma's testimony on these issues because, appellant has not shown that he was harmed by the testimony. [Ex parte Henderson, 384 S.W. 3d 833, 860-61 (Tex. Crim. App. 2012) [See Memorandum Opinion pp. 22-23, para 3].

7

## PRAYER

Timothy Fisher ask this Honorable High Court to either reverse the Court of Appeals Affirmation and send this case back to the Court of Appeals for disposal. OR Have this High Court hold a hearing on the issues presented in the Brief for Appellant. Petitioner thanks the court for its time regarding these matters. Amen.

Respectfully Submitted,

/s/ Timothy Wayne Fisher

Timothy Wayne Fisher
Petitioner / Pro se

# VERIFICATION

I Timothy Wayne Fisher, TDCJ No. 1928112 being presently incarcerated within the James V. ALLRED Unit of the TDCJ CID System, in Wichita County, Texas, do hereby verify and declare under penalty of perjury that the foregoing Petition and the statements made herein, are both true and correct, as well as offered in good faith.

[Civ. Pract. + Rem. Code §132.001,-3. et. seq, /28 U.S.C. §17467].

SIGNED AND DECLARED TO, this 22nd day November, 2015

/s/ Timothy Wayne Fisher

Timothy Wayne Fisher

Petitioner / Pro se

TDCJ No. 1928112

J.V. Allred Unit

2101 FM 369 N.

Iowa Park, TX 76367

9

## CERTIFICATE OF SERVICE

I certify that I have provided a Copy of the foregoing Petition, VIA United States Postal Service to the State Prosecutor's Office, P.O. Box 12405, Austin, TX 78711; and, the Harris County District Attorney, 1201 Franklin, Suite 600, Houston, Texas 77002.

/s/ *Timothy Wayne Fisher*
Timothy Wayne Fisher

c/c
DKW
File

10

Opinion issued August 25, 2015



In The

# Court of Appeals

For The

# First District of Texas

―――――――――

## NO. 01-14-00400-CR

―――――――――

**TIMOTHY WAYNE FISHER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 184th District Court**
**Harris County, Texas**
**Trial Court Case No. 1379925**

## MEMORANDUM OPINION

A jury found appellant, Timothy Wayne Fisher, guilty of the felony offense

of reckless injury to a child.[1]  After finding true the allegation in an enhancement

――――――――

[1]     *See* TEX. PENAL CODE ANN. § 22.04(a)(1), (e) (Vernon Supp. 2014).

paragraph that he had previously been convicted of a felony offense, the jury assessed his punishment at confinement for ninety years and a fine of $10,000. In his sole issue, appellant contends that the trial court erred in admitting certain expert testimony.

We modify the trial court's judgment and affirm as modified.

## Background

William Dickerson, the complainant's great-grandfather, testified that appellant and Tegan Shows, Dickerson's granddaughter, lived with Shows's six-year old son, Lexicon ("Lex"), in a trailer on a piece of agricultural property near the home of Dickerson and his wife, Graciela Dickerson. Dickerson explained that on January 24, 2013, Shows, while incarcerated, gave birth to the complainant, who was released to appellant upon being discharged from the hospital. Dickerson first met the complainant on February 4, 2013, when appellant "brought the baby over for [his] wife to watch." On that day, Dickerson noticed that the complainant had a scratch under his eye and asked appellant how it had happened. Appellant "didn't know." The complainant also had, on his face, other scratches that Dickerson believed were self-inflicted and caused by the baby's fingernails, but he did not have any bruising. The complainant stayed at the Dickersons' house for approximately "three and a half hours" that day.

2

Appellant asked Graciela to watch the complainant again on February 6, 2013, and he brought him back to the Dickersons' house that day. Although the complainant was supposed to be at the house for only a few hours, appellant called "around" 5:00 or 6:00 p.m., stating that he was having "car problems." He then called again "around" 8:30 or 9:00 p.m., stating that "[h]e was still broke down" and "wasn't going to be able to" pick up the complainant. Dickerson told appellant that he and Graciela would "take care of the kids" for the night, and he later "went and got Lex[]" from Sherrill Jenkins, who was watching him at her store across the street.

Dickerson explained that "things" with the complainant were "[j]ust fine" on the evening of February 6, 2013. He did not "cry[] more than a baby would normally," and there was nothing "out of the ordinary about the baby." The complainant did not have any bruises or "bumps on his head," and Dickerson did not see him make any "jerking" or "involuntary movements that . . . seem[ed] abnormal."

Before leaving for work on February 7, 2013, Dickerson again did not "observe anything wrong" with the complainant. He had no bruising that morning, and he was not "involuntary[ily] jerking" or doing anything "that would stand out . . . as abnormal." When Dickerson arrived home from work that evening, the complainant "was [still] fine" and had no bruising. And, when appellant came to

3

"pick the baby [and Lex] up" around 8:30 or 9:00 p.m., there was nothing "abnormal" about the complainant. As appellant "headed out the door with him," Dickerson did not "notice anything" wrong with the complainant. The next day, however, Dickerson learned from Jenkins that the complainant "was at the hospital."

Dickerson further testified that, during the entire time that the complainant was staying at his house, he was "eating fine," "would finish a bottle," and was having "[n]ormal bowel movements." No one had any "accidents" involving the complainant; nor did anyone "harm the baby[,] or play rough" with him. And "[o]ther than th[e] scratch under [his] eye and [the] scratches possibly from fingernails," Dickerson did not see "anything wrong" with the complainant while he was staying at the Dickersons' home.

Graciela testified that the first time that she saw the complainant was on February 4, 2013, when she "took care of him." Appellant brought the complainant to her house so that she could watch him while appellant worked. On that day, the complainant was "doing very well," was eating well, and there was nothing "out of the ordinary" regarding the way his arms and legs moved.

Graciela next saw the complainant on February 6, 2013, when appellant brought him to her house again so that appellant could work. Although Graciela was supposed to watch the complainant only for a few hours, he and Lex, who

4

came over to the Dickersons' house that evening, ended up spending the night with her because appellant had "troubles with his truck." Graciela explained that the complainant slept in a crib and she stayed in the same room with him, feeding him "every two hours." She noted that "he ate [and slept] very well." The next day, Graciela stayed at home with the complainant and "took care of [him]." When appellant arrived "around" 8:00 or 8:30 p.m. to pick up Lex and the complainant, the baby was "[v]ery well."

Graciela further explained that while the complainant stayed with her, he did not "have any bruises or marks on his body." She noted that there was no "accident" when she bathed the complainant and he did not "hit his head" on anything. He was not "struck with anything" or "dropped." The complainant did not have trouble eating, and his bowel movements were normal. She did not "notice anything abnormal or out of the ordinary" with the complainant; he was not making any "weird jerking" movements. And he did not "get hurt in any way" while she was watching him. However, on the morning of February 8, 2013, when Graciela saw appellant walking with the complainant and Lex towards Lex's school, she heard the complainant crying.

Angela Hansen, the counselor at Lex's elementary school, testified that on the morning of February 8, 2013, she came "into contact" with appellant, Lex, and the complainant, as appellant was "drop[ping] Lex off" at the school. She noted

that the complainant had "a lot of scratches on [his] eyes, on [his] face"; his lips "were very dry, [and it] look[ed] like [he] had dirt around [his] mouth." His skin was "kind of yellow looking," and he "had what appeared to be a bruise on the left side of [his] face." Appellant told Hansen that he "didn't know" how the complainant "got the bruise," but said "it was there when he had picked [him] up from the [Dickersons]." It appeared that appellant was either "sleep depriv[ed]" or possibly "high." Hansen's "interaction" with appellant and her "observations" of the complainant caused her to be concerned, and after appellant left the school with the complainant, she contacted law enforcement officials.

Kathy Otte, a workroom aide at Lex's elementary school, testified that when she first saw the complainant about a week prior to February 8, 2013, he was "[b]eautiful." She next saw appellant and the complainant a few days later at a gas station, and she could hear the complainant crying from inside appellant's truck. The next week, when she saw appellant and the complainant as appellant was dropping Lex off at school, the complainant was "screaming and crying," and he appeared "[a]wful." His diaper was "a real yellow mustard color" and his nose and ears were dirty; however, she did not see any bruises.

Otte, on February 8, 2013, saw appellant and the complainant in the office of the school, and the complainant was "not right." When she picked him up from his stroller, the complainant "moved as if startled" and "sh[ook] a little bit." His eyes

were "glossy," and he looked like he was "out of it" and "not coherent." When Otte noted that the complainant had a bruise on the side of his head, appellant told her that the complainant had "rolled off the bed." As Otte held the complainant, his eyes "rolled back in his head," and he "kept doing [a] startling motion." At that time, Otte was concerned that something was "wrong with the [complainant]."

Jenkins testified that she owns the property on which appellant, Lex, and the complainant lived in a trailer and a store across the street from that property. In the afternoon on February 8, 2013, appellant brought the complainant to her store and said, "I can't make the baby stop crying. I don't know what's wrong." He explained that the complainant might have been upset because he had fed the baby with a different type formula. Appellant, who appeared "concerned" and "frustrated," hoped that Jenkins could "help him get the baby to stop crying." According to Jenkins, "[h]e didn't know what to do with [the complainant]." When she held the complainant, she noted that he had bruises on both of his cheeks near his mouth. And appellant told her that he did not know how the complainant was bruised.

Jenkins subsequently left appellant and the complainant at her store to go purchase the correct formula for the complainant. Shortly after she returned to the store, an "officer" and a "CPS worker" "showed up." The "CPS worker" "looked

at" the complainant and said that he was "seizing." After a call for emergency assistance, the complainant was taken to a hospital by an ambulance.

Amber Dewalt, who was previously employed as an investigator for the Texas Department of Family and Protective Services, testified that on February 8, 2013, she was assigned to investigate the complainant's case. When she arrived at Jenkins' store, Dewalt observed "bruising" on the complainant, "a scratch on his lip about an inch long," and that the areas "around his eyes were red." As she held the complainant, "his right arm and right leg started to jerk in unison," which is not "a normal movement for a newborn." Dewalt opined that the complainant could have had a "head injury," noted that he needed to go to a hospital, and called for emergency assistance.

When emergency assistance personnel arrived, they placed the complainant in the back of an ambulance and removed his clothes. At that time, Dewalt saw that he had "[p]urple bruises" on his "shoulder area," his breathing had "slowed," and he had "turned gray in color."

Dewalt explained that when she spoke to appellant before the arrival of the ambulance, he did not "mention" that he had had "any problems with the baby" during the previous night. Appellant did state that the complainant "was fussy th[e] morning o[f] the 8th" and he had noticed the bruises on the complainant's face, but "didn't know" how they had gotten there. He did not "mention anything

8

about [the Dickersons] or [the] bruising being there when he picked up the [complainant]" from their care. At the hospital, Dewalt again spoke with appellant, notifying him that there was "concern about how the [complainant's] injuries were inflicted." After hearing about her concern, appellant told Dewalt that he "didn't cause" the complainant's injuries.

Patrick Brockman, a paramedic for Cypress Creek EMS, testified that on February 8, 2013, he was dispatched to Jenkins' store. After arriving at the store, placing the complainant in the back of the ambulance, and removing his clothes, Brockman saw that he had "bruising . . . underneath [his] armpits, [on] the right side of [his] chest, underneath [his] earlobes, . . . underneath [his] eyes, [around his] nose region, and [o]n the back of [his] neck." Brockman classified the bruising as "[e]arly stage" and "abnormal," explaining that the complainant "should not have any bruising at all at []his age." Brockman further noted that the complainant's body was "limp," which indicated a "neurological issue," and he was "a bluish grayish color[]," indicating a "lack of oxygen." On the ride to the hospital, the complainant had "periods of abdominal respirations, which are abnormal breathing patterns, characterized by gasps" and "shallow respirations." And Brockman described the complainant's mental status as "very lethargic" and "postictal."

9

Dr. Cara Doughty, a Texas Children's Hospital ("TCH") pediatric emergency room doctor, testified that on February 8, 2013, she "c[a]me into contact" with the complainant in the hospital's emergency room. He was "recognized as critically ill," "in danger of dying," and his "mental status was such that he was really not able to breathe normally." It was "immediately noticeable" to Doughty that the complainant "was extremely pale and had multiple bruises on his face and his shoulders and upper arms." She further explained that the complainant had bruising on his neck, in his armpit, and across his upper chest and face. Also, his eyelids were bruised and swollen, and he had an abrasion or scrape on his bottom eyelid. Doughty noted that the complainant had a skull fracture on the left side of his head, he suffered from subdural bleeding, and his entire brain was swelling. And she saw the complainant having seizures, which would have been caused by his brain injuries.

Dr. Doughty further testified that the "combination" of the complainant's "mental status," "bruising," and "very pale state," along with the results of a "CT scan," constituted "a constellation of symptoms that [were] most consistent with trauma or abuse." She opined that the complainant's injuries were caused by blunt force trauma and "[s]omeone else ha[d] to do this to [him]." He simply could not have caused his injuries himself. Doughty also explained that the complainant's injuries "didn't occur from everyday handling"—they required "significant direct

force to [the] head." Moreover, the injuries were not consistent with the complainant "being dropped one time to the floor," "with rolling off a bed," or with hitting his head on the side of a sink while being bathed. Instead, "the force that would have caused the[] [complainant's] injuries would [have to] be greater than necessary to handle [him] in day-to-day activities." "It would require substantially more force" than changing the complainant's diaper or feeding, burping, or rocking the complainant.

Dr. Marcella Donaruma, a child abuse pediatrician at TCH and an assistant professor of pediatrics and the fellowship director for the child abuse pediatrics program at Baylor College of Medicine, testified that child abuse pediatrics is a recognized subspecialty in the medical community. She explained that "child abuse pediatrics is a branch of pediatrics that is devoted to the assessment of children who are suspected victims of child maltreatment in the form of physical abuse, sexual abuse, neglect, or medical child abuse."

On March 28, 2013, Dr. Donaruma saw the complainant, personally evaluated him, and reviewed the medical records related to his birth. She explained that Shows was in labor with the complainant for forty-three hours. Upon his birth, he had "a sepsis workup" and was "tested for any infection"; however, "[n]othing was found." Although the complainant was born with "meconium," or "stool," in his mouth and "[h]is ability to breathe was not good,"

11

he "perk[ed] up" within five minutes with resuscitation. He was admitted "for observation" to the Neonatal Intensive Care Unit, where an ultrasound of his brain revealed "[n]othing"; he was "fine." Upon his release from the hospital, the complainant was considered "a healthy infant," and nothing about his birth or his mother's labor could have caused the injuries and the trauma he suffered on February 8, 2013.

Dr. Donaruma also consulted with the neurosurgeons who treated the complainant on February 8, 2013 and reviewed his pertinent medical records. She noted that the complainant, who was fifteen-days old at the time of injury, suffered from "abusive head trauma," "abusive skeletal trauma," and "abusive cutaneous trauma." He had, on the left side of his head, a skull fracture that caused his brain to swell and die "inside of [his] skull." And Donaruma opined that the skull fracture was the "result of blunt force trauma to his head. Either his head hitting something very fast and hard, or something hitting his head very fast and hard." The injury was consistent with someone striking the complainant's skull "with an unknown object" or a hand with more force than "necessary to move [him] through the course of daily activities." The injury could not have been caused by "roll[ing] [him] off [a] bed onto the ground," "hit[ting] [him on] the side of [a] sink," or "drop[ping]" him three or four feet. Donaruma further noted that the

12

complainant's injuries could not have been caused by a six-year old, like Lex, because of the force required to inflict them.

The complainant also suffered from a "scalp hematoma"—"a collection of blood . . . over the area where the fracture disturbs the bloods vessels running under the scalp." Dr. Donaruma opined that the scalp hematoma was also caused by "[b]lunt force trauma to [the complainant's] head," likely inflicted by "striking an unknown object into the baby or striking the baby against an unknown object." And the same event likely caused both the skull fracture and the scalp hematoma.

Dr. Donaruma also noted that, at the time of his treatment, the complainant's "whole brain was swelling and dying." He had "two different types of bleeding inside of his head that were fresh. He had fresh blood on the subdural space . . . [and] a subarachnoid hemorrhage." The two types of bleeding could have been caused by the same trauma "that broke the skull" or "a possible whiplash sort of acceleration/deceleration activity that the head went through." The "whiplash injury . . . could have been caused by grabbing and shaking [the] child." The bleeding in the complainant's head was located in several places— "the left side of his head underneath the fracture," "between the two hal[ves] of his brain," and "underneath the thinking part of the brain under the cortex and over the cerebellum."

13

The complainant had also suffered from several other injuries, including a "cervical spine injury," with "the upper most portion of his spine [dislocated] from his head." This injury was consistent "with grabbing and shaking a baby." He also had external and internal damage to his eye—his "retinas were full of hemorrhage"—which was consistent with a "whiplash type of activity." The complainant had a rib fracture, which was "indicative of forceful compression." And he had "facial bruising on both eyelids . . . concentrated along [the] tarsal . . . plate," "where the eyelashes come out," his left jaw, in front of his left ear, and inside of his left ear. The complainant also had bruising in his armpits and on his shoulders, chest, arm, and neck area, which is often seen with "frustration with feeding."

Dr. Donaruma described the complainant's condition at the time he was brought to the hospital on February 8, 2013 as critical and unstable. She noted that without treatment, he would have died. And, "[g]iven the nature of his injuries [and] the amount of fresh blood that was seen on his brain and the critical condition that he was in upon being checked into the hospital at 5:06 p.m.," the complainant's injuries were likely inflicted within the twelve hours prior to his admission, sometime earlier on February 8, 2013. Donaruma, however, cautioned that her timeframe estimate was "rough[]."

14

Finally, Dr. Donaruma opined that the complainant "will never function like another child of the same age ever. He will be limited not only in his ability to think . . . but he won't understand human interaction." For instance, "when you smile at somebody and they smile back, that feels good. He won't have that." In her opinion, the complainant was "a victim of physical abuse." However, although his injuries were not accidental, she could not say who in fact had caused his injuries.

Appellant testified that on the morning of February 4, 2013, he took the complainant to the Dickersons' house so that he could go to work. When he returned in the afternoon to pick him up, the complainant "was a normal baby" and "nothing was wrong with him." And, on the morning of February 6, 2013, when he again dropped the complainant off at the Dickersons' home, he was "normal" and "nothing was wrong with him."

Because appellant's "truck broke down" later in the day on February 6, 2013, while he was working, he was not able to pick up the complainant that evening. When he arrived at the Dickersons' house at around 9:30 or 9:40 p.m. on February 7, 2013 to pick up the complainant, the complainant was crying, but appellant "didn't think nothing was like wrong with [him] . . . other than the scratches [he] s[aw] on his face." The complainant "had a big scratch above his lip," which had not yet "scab[bed]," and another scratch under his eye. When

15

appellant asked "how . . . [the complainant] g[o]t the[] scratches," Dickerson told him that he had scratched himself. Appellant did not see any bruises on the complainant at that time.

After he took the complainant home, appellant tried to feed him "a bit" and then rocked him until he fell asleep. Once asleep, appellant "put him in [appellant's] bed and went in[to] the living room" to find Lex. After putting Lex to bed, appellant returned to his room and fell asleep. The complainant "woke up . . . numerous times" during the night, and appellant rocked him, checked his diaper, and fed him. Appellant last fed the complainant at approximately 5:45 or 6:00 a.m. He did not see any bruises on the complainant during the night. When appellant awoke at approximately 8:45 or 9:00 a.m. on February 8, 2013, the complainant was crying. Although the complainant "wasn't his normal self" that morning, appellant did not see any bruises on him.

Appellant further testified that when he, along with the complainant, walked Lex to school, Otte "and the other people that were there" asked appellant "how the baby had got the scratches and what caused him to obtain the scratches." Appellant "told them that the baby had the scratch from the day before when[] [he had] picked him up from . . . [the] Dickerson[s'] house." Appellant had not yet noticed any bruises on the complainant at the time they arrived at the school.

16

However, while at the school, at "roughly 10:30 in the morning," he first saw the bruises on the complainant.

After appellant left the school with the complainant, he became "concerned" about the complainant's "fussiness." He "proceeded to head to [his] house," where he fed the complainant and rocked him to sleep. Later, while appellant was outside working on his truck, he heard the complainant crying. Appellant then changed his diaper and fed him again. A law enforcement officer then arrived at his house and "looked over" the complainant. Appellant told the officer that the complainant "had the scratches on his face the night before when [he] picked him up" from the Dickersons' home. The officer told appellant that he thought that "nothing was wrong" with the complainant; however, the officer only examined the complainant while he was clothed. After the officer left, appellant took the complainant to Jenkins' store because he did not know what was wrong with him, and appellant thought that she could help.

At the store, Jenkins "took [the complainant] from [appellant] and asked [him] how the baby had got[ten] the little bruises on his face." Appellant told her "that's how [the complainant] was the night before" and he "didn't know how they got there." Jenkins then left her store to purchase formula for the complainant, and upon her return, Dewalt from "CPS" arrived. Dewalt told appellant that the complainant needed medical attention because he was having seizures, and

17

appellant "told her she should call 9-1-1 if [his] son was that seriously ill." He, however, while at Jenkins' store, "didn't really see anything different" about the complainant that required serious medical intervention.

Appellant further testified that when the complainant arrived at the hospital, he was "screaming and crying" and it "wasn't like a healthy baby scream." At the hospital, appellant told a law enforcement officer that when he picked up the complainant from the Dickersons' house, he had "scratches on his face," but appellant "didn't believe there was anything else wrong with him." Appellant also told a nurse that the complainant had "scratches underneath his eye and above his lip when [he] picked him up from the [Dickersons'] house."

Dr. Leo Hochhauser, an associate professor of radiology, specializing in the field of neuroradiology at the University of Texas Medical School at Houston, reviewed the complainant's medical records and testified for appellant. The brain imaging, taken on February 8, 2013, showed that the complainant had suffered from "blunt trauma" to his brain, resulting in swelling and brain damage. Among other injuries, the complainant had "a depressed skull fracture," a subdural hematoma, and subarachnoid hemorrhaging. Hochhauser estimated that the injuries were inflicted sometime between three to thirty-six hours prior to the taking of the brain imaging on February 8, 2013. He opined that it was more likely that the complainant's injuries were "pretty, pretty recent" or "very recent" in time

18

to the taking of the brain imagining, "like within [the previous] 12 or 24 hours." Further, if the complainant "was eating well throughout the night of . . . Thursday, February 7th, going into Friday[,] February 8th," it is likely that the trauma that caused the complainant's injuries did not occur until February 8, 2013.

Dr. Hochhauser further opined that because there was no reported accident, the complainant's injuries were non-accidental. He noted that "a 15-day-old infant [presenting] with retinal hemorrhaging, brain bleeding and swelling, a skull fracture, possible rib fracture and other cutaneous trauma or bruising" "indicates child abuse." Moreover, the "bleeding all over th[e] baby's brain . . . [was] consistent with grabbing and shaking [the] baby," which could have occurred "at the same time" as the complainant was "hit into an object."

Finally, appellant presented the testimony of John Laughlin, a forensic engineer practicing in the areas or mechanical, biochemical, and neuro electrical engineering. He "perform[ed] a biomechanical early childhood analysis of [the complainant's] injuries" and opined that "the cause of [the complainant's] injuries [was] a blow to the top of the head from a fall in which . . . he hit[] the ground . . . head first." Laughlin explained that, in regard to the force needed to cause the complainant's injuries, the complainant would have hit the ground traveling at "8 miles an hour."

## Standard of Review

We review a trial court's ruling on the admissibility of expert testimony for an abuse of discretion. *Lagrone v. State*, 942 S.W.2d 602, 616 (Tex. Crim. App. 1997); *Hernandez v. State*, 53 S.W.3d 742, 750 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd). We consider the trial court's ruling in light of the evidence presented at the time of its ruling, and we will uphold the ruling if it lies within the zone of reasonable disagreement. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). We cannot conclude that a trial court abused its discretion merely because, under the same circumstances, we might have ruled differently. *See Hernandez*, 53 S.W.3d at 750. Rather, we gauge an abuse of discretion by whether the trial court acted without reference to any guiding rules or principles. *Id.* Thus, a trial court enjoys wide latitude in determining whether expert testimony is admissible. *Id.*

## Expert Testimony

In his sole issue, appellant argues that because Dr. Donaruma's conclusions were based on an "unreliable methodology," the trial court erred in allowing her to testify as an expert "regarding the timing of the [complainant's] injuries, the amount of force . . . used to injure the complainant, and whether the complainant's injuries were caused intentionally or accidentally."

20

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." TEX. R. EVID. 702, 61 TEX. B.J. 374, 392 (Tex. & Tex. Crim. App. 1998, amended 2015).[2] Before admitting expert testimony, a trial court must determine that (1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education, (2) the subject matter of the testimony is an appropriate one for expert testimony, and (3) admitting the expert testimony will actually assist the fact-finder in deciding the case. *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006). Thus, the trial court must determine that the expert is qualified to testify and the proffered testimony is relevant and reliable. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006). The proponent of the expert testimony bears the burden of showing by clear and convincing evidence that the expert's testimony is relevant and reliable. *State v. Smith*, 335 S.W.3d 706, 711–12 (Tex. App.—Houston [14th Dist.] 2011, pet ref'd).

"'[R]eliability depends upon whether the evidence has its basis in sound scientific methodology,'" which "'demands a certain technical showing.'" *Vela*,

---

[2] Effective April 1, 2015, the Texas Supreme Court has adopted amendments to the Texas Rules of Evidence. *See* 78 TEX. B.J. 42, 42 (Tex. 2015). The Amendments to rule 702 were stylistic in nature. *Id.*

209 S.W.3d at 133 (alteration in original) (quoting *Jordan v. State*, 928 S.W.2d 550, 555 (Tex. Crim. App. 1996)). Such a showing allows a trial court to "'weed out testimony pertaining to so-called junk science.'" *Id.* (quoting *Jordan*, 928 S.W.2d at 555). "Thus, just because 'junk science or otherwise inadequately tested scientific theories might be shown to relate to the facts of a case,' it will not always have a sufficiently reliable basis." *Id.* (quoting *Jordan*, 928 S.W.2d at 555). If a court determines that underlying facts or data do not provide a sufficient basis for an expert's opinion, the opinion is inadmissible. TEX. R. EVID. 705(c); *Vela*, 209 S.W.3d at 133.

Appellant asserts that Dr. Donaruma's conclusions, "in regard[] to the time frame of [the complainant's] injuries" and "the amount of force used to inflict [the complainant's] injuries," "do[] not rely on established principles and methodology" in the "medical field of determining the age of blood" or in the "medical or biomechanical engineering fields." He also challenges the methodology used to support Donaruma's conclusion that the complainant's "injuries were caused by intentional physical abuse."

We need not decide whether the trial court erred in admitting Dr. Donaruma's testimony on these issues because, even were we to conclude that the trial court erred in admitting the evidence, appellant has not shown that he was harmed by the testimony. *See Ex parte Henderson*, 384 S.W.3d 833, 860–61

22

(Tex. Crim. App. 2012) (relief may not be granted unless "the admission of unreliable testimony was harmful").

The erroneous admission of evidence constitutes nonconstitutional error. *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Non-constitutional error requires reversal only if it affects the substantial rights of the accused. *See* TEX. R. APP. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). We will not overturn a criminal conviction for non-constitutional error if, after examining the record, we have fair assurance that the error did not influence the jury, or had but a slight effect. *Barshaw*, 342 S.W.3d at 93.

We review the entire record to ascertain the effect or influence on the verdict of the wrongfully admitted evidence. *Id.* In assessing the likelihood that the jury's decision was improperly influenced, we consider the record as a whole, including testimony and physical evidence, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in case. *Id.* at 94; *see also Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002). Error in the admission of evidence may be

23

rendered harmless when substantially the same evidence is admitted elsewhere without objection. *See Leday v. State*, 983 S.W.2d 713, 717–18 (Tex. Crim. App. 1998); *Anderson v. State*, 717 S.W.2d 622, 627–68 (Tex. Crim. App. 1986).

Appellant argues that he was harmed by Dr. Donaruma's testimony because the entire case against him was based on circumstantial evidence and he, at trial, established that the complainant's injuries could have had other possible causes, which "had the potential to create a reasonable doubt." Further, "the two unreliable conclusions that . . . Donaruma reached regarding the amount of force used and the timing of [the complainant's] injur[ies] were used by the State to pinpoint . . . [a]ppellant as the only potential source of [the complainant's] injuries." The State asserts that "[a]ppellant was not harmed by [the admission of Donaruma's testimony] . . . because substantially similar testimony was admitted through . . . other [witnesses] without objection by appellant."

As noted above, Dr. Donaruma testified that, "[g]iven the nature of [the complainant's] injuries [and] the amount of fresh blood that was seen on his brain and the critical condition that he was in upon being checked into the hospital at 5:06 p.m." on February 8, 2013, the complainant's injuries were likely inflicted within twelve hours prior to his admission. In other words, it was likely that the complainant's injuries were inflicted "sometime on February 8, 2013." However, Donaruma also explained that her timeframe estimate was "rough[]."

In regard to the amount of force required to cause the complainant's injuries, Dr. Donaruma testified that "the type of force that [was] require[d] to result in th[e] type of damage [sustained by the complainant was] more than necessary to move a child through the course of daily activities." Donaruma also described the force needed to bruise a fifteen-day-old baby's neck as "excessive" and stated that the complainant's "whiplash injury" required "a forceful and violent acceleration and deceleration." According to Donaruma, "a 6-year-old [could not] have caused [the complainant's] injuries" because he "would not have the strength and coordination to sustain th[e] kind of force" necessary.

As to the cause of the complainant's injuries, Dr. Donaruma testified that the injuries were not accidental but the "result of blunt force trauma to [the] head," such as the complainant's "head hitting something very fast and hard, or something hitting [the complainant's] head very fast and hard." According to Donaruma, the complainant's injuries were consistent with someone striking the complainant's skull "with an unknown object" or a hand. Donaruma also explained that some of the complainant's injuries could have been the result of a "whiplash injury," "caused by grabbing and shaking" the complainant. In her opinion, the complainant was "a victim of physical abuse" and "child abuse." And nothing about the complainant's birth or his mother's labor caused the injuries and trauma that he suffered on February 8, 2013.

25

Notably, our review of the record reveals that Dr. Donaruma was not the only witness to testify to these conclusions at trial. For instance, Dr. Hochhauser, one of appellant's expert witnesses, testified, without objection, that the complainant's injuries could have occurred anytime within "three hours to ... 36 hours" of the taking of his brain imagining at the hospital. He also described the complainant's injuries as "pretty, pretty recent." And when asked what "time frame" he "put on [the complainant's] injuries from the time of [his brain imaging]" at the hospital, Hochhauser opined that the injuries were "very recent" and likely occurred "within [the preceding] 12 or 24 hours." At "most," Hochhauser stated that he "would go back ... 36 hours" but he qualified this opinion, noting that the complainant's injuries "seem[ed] rather recent." And, when asked if he would have expected the trauma to have occurred on February 8, 2013 "if somebody [had] reported to the hospital that the [the complainant] was eating well throughout the night of ... Thursday, February 7th, going into Friday[,] February 8th," Hochhauser agreed.[3]

Dr. Hochhauser also testified that the complainant sustained injuries due to a "blunt force trauma," and he opined that the complainant's injuries were not

---

[3] We note that the complainant's medical records, which were admitted into evidence at trial, without objection, place the time of the complainant's injuries as February 8, 2013. *See Duncan v. State*, 95 S.W.3d 669, 671–72 (Tex. App.— Houston [1st Dist.] 2002, pet. ref'd) (improper admission of testimony harmless because similar testimony admitted through complainant, pediatrician, and medical records).

accidental. According to Hochhauser, "a 15-day-old infant with retinal hemorrhaging, brain bleeding and swelling, a skull fracture, possible rib fracture and other cutaneous trauma or bruising" "indicates child abuse." And the "bleeding all over th[e] [complainant's] brain . . . [was] consistent with [someone] grabbing and shaking [the] baby," which could have occurred "at the same time" as the complainant was "hit into an object."

In regard to the amount of force necessary to cause the complainant's injuries, Dr. Doughty, the emergency room doctor who treated the complainant, testified, without objection, that his injuries "didn't occur from everyday handling," and they required "significant direct force to [the complainant's] head." Doughty also explained that "the force that would have caused the[] injuries would be greater than necessary to handle [the complainant] in day-to-day activities." And "[i]t would require substantially more force" than necessary to change the complainant's diaper or feed, burp, or rock the complainant.[4]

As to the cause of the complainant's injuries, Dr. Doughty explained that the "constellation of [the complainant's] symptoms . . . [were] most consistent with trauma or abuse." And she opined that the complainant's injuries were caused by

---

[4] Further, even though Laughlin, appellant's own forensics expert, opined that the complainant's injuries resulted from a fall, rather than a blunt force trauma, he also testified, without objection, that "a very good rate" of force was required to cause the complainant's injuries. Specifically, Laughlin testified that the complainant would have been traveling at "8 miles an hour" when he hit the ground in order to sustain his injuries.

"blunt trauma" and "shaking," and "[s]omeone else ha[d] to do this" to the complainant. According to Doughty, the complainant's injuries were not "accidental"; for instance, they were not the result of "an accidental single fall" or caused by "accidental mishandling." Instead, "there could [have] be[en] kind of a combination of a shaking force as well as an impact where the head . . . hit[] something, hit[] a surface." Further, Doughty explained that "[t]here is no way" that the complainant's injuries were sustained during his birth.[5]

It has long been the rule that any error in the admission of evidence is harmless where other evidence that is substantially similar was admitted without objection, either before or after the complained-of ruling, regardless of whether the other evidence was introduced by the defendant or the State. *See Leday*, 983 S.W.2d at 717–18; *Anderson*, 717 S.W.2d at 627–28; *Johnson v. State*, 425 S.W.3d 344, 346 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). Here, other witnesses, without any objection from appellant, proffered the same or substantially similar opinions as those of Dr. Donaruma about the timing of the complainant's injuries, the amount of force needed to cause the complainant's injuries, and the intentional,

---

[5] We also note that Dr. Curtis Kennedy, a TCH pediatric intensive care physician, who testified for appellant, stated, without objection, that the complainant's injuries were "consistent with" "a physical beating, a violent beating." And the written "Physician's Statement," admitted into evidence, without objection, states that the complainant's condition was consistent with abuse and his injuries were caused by a "significant and direct force to his head." *See Duncan*, 95 S.W.3d at 671–72 (improper admission of testimony harmless because similar testimony admitted through complainant, pediatrician, and medical records).

28

rather than accidental, nature of the complainant's injuries. Accordingly, we hold that any error of the trial court in admitting the complained-of portions of Donaruma's expert testimony was harmless.

We overrule appellant's sole issue.

## Modification of Judgment

We note that the trial court's written judgment does not accurately comport with the record in this case in that the judgment reflects that appellant pleaded "[t]rue" to the allegation in an enhancement paragraph that he had previously been convicted of a felony offense. The record reflects that appellant pleaded "[n]ot true" to the allegation. Further, the judgment erroneously reflects that appellant "knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court." In fact, the record reflects that he actually "appeared in person with [c]ounsel."

"[A]ppellate court[s] ha[ve] the power to correct and reform a trial court judgment 'to make the record speak the truth when [they] ha[ve] the necessary data and information to do so, or make any appropriate order as the law and nature of the case may require.'" *Nolan v. State*, 39 S.W.3d 697, 698 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (quoting *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd)). Although neither party has addressed the inconsistencies between the trial court's written judgment and the record, we,

29

based on our review, conclude that portions of the judgment do not accurately comport with the record. *See Asberry*, 813 S.W.2d at 529–30 (authority to correct incorrect judgment not dependent upon request of party).

Accordingly, we modify the trial court's judgment to state that appellant pleaded "not true" to the allegation in the enhancement paragraph. *See Torres v. State*, 391 S.W.3d 179, 185 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (modifying judgment to state defendant pleaded "true" to allegations in enhancement paragraphs); *see also* TEX. R. APP. P. 43.2(b). We further modify the judgment to uncheck the box next to the statement that reads, "Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel in writing in open court," and check the box next to the statement that reads, "Defendant appeared in person with Counsel." *See Haynes v. State*, No. 01-09-00380-CR, 2010 WL 5250881, at *7 (Tex. App.—Houston [1st Dist.] Dec. 9, 2010, pet. ref'd) (mem. op., not designated for publication) (reforming judgment, which incorrectly stated "Defendant appeared in person with Counsel" rather than "Defendant knowingly, intelligently, and voluntarily waived the right" to counsel (internal quotations omitted)); *see also* TEX. R. APP. P. 43.2(b).

30

Timothy Wayne Fisher
TDCJ-No. 1928112
James V. Allred Unit
2101 FM 369 North
Iowa Park, TX 76367

To The Clerk of the Court
of Criminal Appeals of Texas
P.O. Box 12308, Capitol Station,
Austin, Texas 78711

**Legal Mail**





