In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-17-00281-CR
_____

TYRECE D'ANDRE HARRIS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
Jefferson County, Texas
Trial Cause No. 16-24974

MEMORANDUM OPINION

A jury convicted appellant Tyrece D'Andre Harris of murder and assessed punishment at confinement for life. In five appellate issues, Harris argues that (1) the evidence was insufficient to support his conviction because the testimony of three accomplice witnesses was not corroborated; (2) he was denied a fair trial because the trial court did not properly submit an accomplice witness instruction; (3) the trial court erred by overruling his objection to a video showing him with a

1

handgun; (4) the trial court erred by overruling his objection to "question and testimony" regarding whether witnesses were lying after the State created a false impression during its cross-examination of Harris's mother; and (5) he was denied due process by the introduction of evidence that he was continuously in custody from arrest through trial. We affirm the trial court's judgment.

## THE EVIDENCE

Khari Walker testified that Harris brought her home from school on April 20, 2016. Walker testified that Harris had music playing in the car and was holding a "really small" shiny silver gun in his hand. According to Walker, she videoed Harris holding the gun, and a copy of the video was introduced into evidence and played for the jury over defense counsel's Rule 404(b) objection. The State argued that the evidence was relevant because the firearm depicted in the video matched the description of the firearm Harris possessed on the night of the shooting. In overruling defense counsel's objection, the trial judge stated that the evidence was admissible under Rule 404, was relevant as "direct evidence toward the commission of the elements of the offense," and the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, "or other considerations under Rule 403 and is admissible."

The victim's wife, Nicola, testified that on April 26, 2016, she and the victim had left the garage door of their home partially open because she was feeding some cats in the neighborhood. Nicola explained that her son slept with her at night, and the victim usually slept downstairs. According to Nicola, the victim typically awakened before she did, and he would come upstairs around 6:30 a.m. to wake her and take their son downstairs. Nicola awakened at approximately 6:55 a.m. on the date in question and saw that her son was still in bed beside her, and she realized that the victim had not been upstairs. Nicola testified that she called the victim's cell phone, and she could hear it ringing downstairs. Nicola became worried that something was wrong, so she went downstairs to look for the victim, and when she went toward the kitchen, she saw him lying on the floor on his left side, and he appeared to be dead. Nicola called 911 and rolled the victim onto his back to attempt CPR, but after performing a few compressions, she realized that he was dead.[1] Nicola testified that she believed the murder occurred at approximately 2:30 a.m. because "a neighbor heard something that woke her up."

Officer Jimmy Bartley of the Beaumont Police Department testified that he was dispatched to the victim's residence on the date in question, and although he

---

[1]A recording of the 911 call was admitted into evidence and played for the jury during the testimony of Sergeant Shawn Tolley, who supervises the 911 center and dispatch office for the Beaumont Police Department.

was the first officer to arrive, EMS and the fire department were already at the scene. Bartley testified that he found the victim in the kitchen area, and he saw a wound under the victim's left arm. When Bartley realized that the victim did not die a natural death, he notified his sergeant and asked that detectives come to the scene. Upon checking outside the victim's residence, officers found a backpack or duffel bag and a white shirt near the garage door.

Officer Gerome Watkins with the City of Beaumont Police Department testified that he was dispatched to the victim's residence to secure the scene from the outside and to assist Bartley. Watkins explained that while walking along the side of the victim's residence, he saw an Apple cell phone lying in the grass. Watkins also saw a black duffel bag with a pair of pliers and a white T-shirt on top of it.

Angelica Hernandez, a technician for the Beaumont Police Department, testified that she responds to scenes to assist detectives and officers, takes photographs and videos, collects evidence, and processes the scene "for any kind of items of evidentiary value." Hernandez responded to the scene at the victim's home. A video of the walkthrough was admitted into evidence. According to Hernandez, one of the items she collected was an iPhone. Hernandez swabbed the iPhone for DNA and processed it for fingerprints. In addition, Hernandez collected a white T-shirt from the scene. According to Hernandez, she also collected a black duffel bag,

4

which contained a pair of pliers and two live rounds of ammunition. Hernandez testified that the ammunition rounds were pistol rounds.

Detective Sergeant Patrick Barton of the Beaumont Police Department testified that patrol called him to the scene. Upon arriving, Barton saw "[t]he body of an apparently deceased person in the kitchen." Barton observed that the victim had an entry wound, possibly a gunshot wound, under his left arm. Barton and two other detectives spoke with Nicola to obtain information from her. According to Barton, based upon the appearance of the blood beneath the victim, the victim had likely been deceased for several hours.

Barton testified that an Apple iPhone was found in the grass adjacent to the fence, and a duffel bag was located near the garage. Barton explained that one of the other detectives located the owner of the phone, Reginald Collins. Barton testified that learning Collins's identity and taking his statement significantly narrowed the focus of the investigation. According to Barton, after Collins's statement was taken, officers learned of three individuals with whom they needed to speak: Tyrese Corbin, Javarian Brooks, and Harris. Barton explained that what Collins, Corbin, and Brooks related to officers was against their penal interest, and after speaking with those men, the police developed Harris as a suspect in the victim's murder and

5

obtained a warrant for Harris's arrest. Barton testified that Harris ultimately turned himself in at the police station.

Barton testified that Collins, Corbin, and Brooks were never arrested regarding the death of the victim. Barton explained that Collins stated that he, Corbin, Brooks, and Harris were together on the night of the victim's murder, and "they were going to that neighborhood looking for unlocked cars to burglarize[.]" Collins related to the authorities that when he and the others arrived at the victim's address, they noticed that the garage door was open, and Harris decided to burglarize the garage, so Collins and Harris entered the garage, with Harris using the flashlight app on Collins's iPhone. Barton testified that upon entering the garage, Collins and Harris heard the victim yell and turn on a light, and Collins exited by ducking under the garage door the same way he and Harris had entered. According to Barton, when Collins got outside, he heard a gunshot. Collins told officers that when Harris returned to the car, he no longer had the phone. Barton testified that Corbin "told the same story that Reggie Collins did." Barton explained that, according to Collins, Harris left the garage and jumped over the fence in the same area where the phone was found. According to Barton, the duffel bag was found at the entrance to the garage.

Officer David Apple of the Beaumont Police Department testified that he also responded to the scene. He testified that the iPhone belonged to Reginald Collins's grandmother. Apple explained that officers interviewed Collins, and Collins provided the names of Corbin and Brooks, and after officers interviewed Corbin and Brooks, Harris became a suspect. According to Apple, two auto burglaries occurred in the victim's neighborhood on the same night as the victim's death, and the occurrence of those burglaries coincided with information yielded from the interviews.

Corbin testified that on the date of the offense, he, Brooks, Collins, and Harris went to the area to burglarize vehicles. Corbin testified that no one was carrying a backpack or duffel bag. According to Corbin, Harris was driving. Corbin explained that the group had decided to leave the area after burglarizing some cars, but Harris told the others that he had seen a "little house that we could go to and the garage is open." Corbin testified that he and Brooks laid down and looked inside the garage but did not enter it, but Harris and Collins did enter the garage by crawling underneath the door. Corbin testified that Harris and Collins were in the garage for approximately three minutes. As Corbin looked down, he saw the light in the garage come on and then "just heard pow, pow[,]" and he and Brooks ran toward the car. According to Corbin, one of the noises he heard was Collins striking his head going

7

under the garage door. Corbin explained that Harris and Collins subsequently got to the car, and Corbin smelled gunpowder. According to Corbin, the group eventually reached Brooks's house, and Collins realized that his phone was missing. Corbin testified that he did not know whether Collins or Harris killed the victim because he was not in the garage.

Brooks testified that on the night in question, he, Harris, Collins, and Corbin had gathered at Brooks's house, and they decided to burglarize cars on the west end of town. When they arrived, Brooks went with Corbin, and Harris went with Collins. After Brooks and Corbin had gone through some cars, the four reunited and had decided to leave, but Harris saw a garage that was "halfway open" and decided to crawl underneath the door, and Collins went into the garage with Harris. Brooks testified that Harris was using Collins's phone for light because Harris's phone battery had died, and he explained, "that's how [Collins] got involved [in] going under the garage with him." Brooks testified that he and Corbin stayed outside the garage. While Harris and Collins were inside the garage, Brooks saw a light come on and heard a gunshot, and Brooks and Corbin ran to the car. Brooks heard Collins strike his head as Collins was leaving the garage. Brooks explained that he saw Harris running with a gun. According to Brooks, when Harris arrived at the car, he had "a chrome gun, a pistol." When shown the video of Harris, Brooks testified that

8

the gun in the video looked like the gun Harris had on the night of the offense. According to Brooks, Harris told the others not to say anything about what happened.

Collins testified that he, Brooks, Harris, and Corbin were at Brooks's house on the night of the offense, and Harris brought up the idea of making some money by "carhopping[.]" According to Collins, Harris stole speakers and car television sets. Collins explained that as he and Harris were walking back toward Harris's car, Harris stated that he had noticed a garage door that was slightly open and "he wanted to go check out the garage." Collins testified that Harris looked under the door and then Harris went in and asked Collins to follow him "because his phone was dying[,] and he was going to need my light because it was dark inside there."

Collins testified that he followed Harris into the garage and looked around, and while they were inside, Harris asked Collins for his phone. According to Collins, he and Harris heard footsteps and "got real still." Collins explained that the footsteps grew closer and he heard the light switch, so he dove toward the garage door to leave, and he hit his head but managed to get out. Collins testified that after he managed to get out, he heard a gunshot and ran. Collins also saw Corbin and Brooks running, and they were panicking because they did not know what happened. According to Collins, Harris arrived one or two minutes later and had something in his hand.

9

Collins testified that as Harris got closer to them, they could see that Harris had a small, silver chrome gun. Collins testified that smoke was coming out of the tip of the gun. Collins further testified that the gun in Harris's hand that night was the same gun depicted in the video. According to Collins, Harris told the others that he had been wrestling with the victim and that he had missed when he shot at the victim. In addition, Collins stated that Harris repeatedly told them not to tell anyone.

Dr. John Ralston, the chief forensic pathologist for Forensic Medical of Texas, testified that he performed an autopsy on the victim's body. Ralston testified that the victim had blood on his clothing and his body had "a gunshot wound of entrance and [a] gunshot wound of exit[.]" According to Ralston, the projectile had left the victim's body, so Ralston was unable to recover it. Ralston opined that the victim's cause of death was a gunshot wound to the chest, consistent with a homicide. Ralston explained that the bullet punctured the victim's lung and caused a substantial hemorrhage, but the victim did not die immediately.

Ashlee Kibbe, a forensic scientist with the Texas Department of Public Safety Crime Laboratory in Houston, testified that Harris's DNA was found on one of the cuttings from the white T-shirt found at the crime scene, and the victim was excluded as a contributor. Kibbe explained that three individuals contributed to the DNA found on the T-shirt. According to Kibbe, Harris and one other individual

10

contributed to DNA found on the second cutting from the T-shirt, and the victim was excluded as a contributor. Kibbe testified that Harris and three other individuals also contributed DNA to a swab from the T-shirt, and the victim was excluded as a contributor.

After the State and Harris had rested, the prosecutor and Harris's counsel both stated that they had no objections to the proposed charge. The proposed charge included an accomplice witness instruction, which stated as follows: "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense."

## ISSUE ONE

In his first issue, Harris argues that the evidence is insufficient to support his conviction because "there is no evidence to corroborate" the testimony of Brooks, Corbin, and Collins. The State asserts that Brooks, Corbin, and Collins were not accomplices to the murder as a matter of law and argues that the non-accomplice evidence was sufficient for rational jurors to have found that it tended to connect Harris to the murder.

When reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict and determine whether any

11

rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury is the ultimate authority on the credibility of witnesses and the weight to be given their testimony. *Brooks v. State*, 323 S.W.3d 893, 894, 902 (Tex. Crim. App. 2010); *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. [Panel Op.] 1981). We give deference to the jury's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

Article 38.14 of the Texas Code of Criminal Procedure provides that a defendant cannot be convicted of an offense upon the testimony of an accomplice without other corroborating evidence tending to connect the defendant to the offense. Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005). When reviewing the sufficiency of non-accomplice evidence under article 38.14, we determine whether the inculpatory evidence tends to connect the defendant to the commission of the offense. *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011). "The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense." *Id.*; *see also Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App.

2009). No particular quantity of corroborating evidence is required. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008).

"'Tendency to connect' rather than rational sufficiency is the standard[;] the corroborating evidence need not be sufficient by itself to establish guilt." *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001). Non-accomplice evidence need not directly link the defendant to the commission of the crime. *See id*. A defendant's presence at the scene of a crime, coupled with other suspicious circumstances, can be sufficient to tend to connect the defendant to the commission of the crime. *Id*. at 361-62. When there are conflicting views of the evidence, we defer to the fact finder's resolution of the evidence. *Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 508.

Assuming without deciding that Brooks, Corbin, and Collins were accomplice witnesses, we review the entire record to determine whether the non-accomplice inculpatory evidence tends to connect Harris to the commission of the murder. *See Smith*, 332 S.W.3d at 442; *Solomon*, 49 S.W.3d at 361. The jury heard evidence that a shirt found near the garage door of the victim's home contained Harris's DNA. In addition, the jury heard Hernandez testify that the ammunition rounds she recovered from the scene were pistol rounds. We conclude that the non-accomplice evidence corroborated the accomplice testimony, and the non-accomplice testimony tends to

connect Harris to the offense. *See Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 508; *Solomon*, 49 S.W.3d at 361-62; *see generally* Tex. Code Crim. Proc. Ann. art. 38.14. Viewing all the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. Accordingly, we overrule issue one.

## ISSUE TWO

In his second issue, Harris contends that his right to a fair trial was abrogated by the trial court's failure to properly submit an accomplice witness instruction that applied the law to the facts, as required by article 38.14 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 38.14. As we did in our analysis of issue one, we will assume without deciding that Brooks, Collins, and Corbin were accomplice witnesses.

When reviewing alleged charge error, we determine whether error existed in the charge and, if so, whether sufficient harm resulted from the error to compel reversal. *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005). If a defendant does not object to the alleged charge error at trial, we may reverse the judgment only if the error is so egregious that the defendant did not receive a fair and impartial trial. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *see*

14

*also Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002). In assessing the degree of harm, we must consider the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information revealed by the record. *Almanza*; 686 S.W.2d at 171. We must examine the charge in its entirety rather than as a series of isolated statements. *Holley v. State*, 766 S.W.2d 254, 256 (Tex. Crim. App. 1989); *Iniguez v. State*, 835 S.W.2d 167, 170 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd). "Egregious harm is a difficult standard to prove and such a determination must be done on a case-by-case basis." *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

A trial court's charge must set forth "the law applicable to the case[.]" Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007). In addition to setting forth the applicable law, the trial judge must apply the law to the facts presented. *Gray v. State*, 152 S.W.3d 125, 127 (Tex. Crim. App. 2004). A jury charge which fails to apply the law to the facts adduced at trial is erroneous. *Id*. at 128. It is not sufficient for the jury to receive an abstract instruction on the law because an abstract charge does not inform the jury of what facts would permit it to consider the contested evidence. *Hutch*, 922 S.W.2d at 172-73.

As discussed above, defense counsel did not object to the proposed charge, which did not include an application paragraph explaining the accomplice witness

instruction. Therefore, Harris must demonstrate that the trial court's omission egregiously harmed him. *See Almanza*, 686 S.W.2d at 171. Harris argues that *Mendez v. State*, 545 S.W.3d 548 (Tex. Crim. App. 2018), supports his argument. In *Mendez*, the Court of Criminal Appeals held that a trial court errs when it *sua sponte* gives a defensive jury instruction but fails to apply it to a lesser-included offense. *Mendez*, 545 S.W.3d at 549-50. Additionally, the *Mendez* court held that even if the defendant fails to object to the error, "the resulting claim of jury-charge error is not necessarily forfeited on appeal." *Id*. at 552. However, the Court of Criminal Appeals further held that its opinion only affects "which of *Almanza*'s dual standards of review is to apply." *Id*. If the defendant did not object, then reversal is warranted only upon a showing of "'egregious harm' such that the defendant was deprived of 'a fair and impartial trial.'" *Id*.

As we determined in our analysis of Harris's first issue, assuming without deciding that Brooks, Collins, and Corbin were accomplice witnesses and that the trial court therefore erred by giving an incomplete accomplice witness instruction, we conclude that Harris has not demonstrated egregious harm. As explained in our analysis of issue one, we conclude that the non-accomplice evidence corroborated the accomplice testimony, and the non-accomplice testimony tends to connect Harris to the offense. *See Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 508; *Solomon*,

16

49 S.W.3d at 361-62; *see also generally* Tex. Code Crim. Proc. Ann. art. 38.14. We therefore hold that the trial court's failure to give a correct accomplice-witness instruction did not egregiously harm Harris. *See Mendez*, 545 S.W.3d at 549-52; *Almanza*, 686 S.W.2d at 171; *see also Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 508; *Solomon*, 49 S.W.3d at 361-62; *see also generally* Tex. Code Crim. Proc. Ann. art. 38.14. Accordingly, we overrule issue two.

## ISSUE THREE

In issue three, Harris asserts that the trial court erred by overruling his objection to the video that showed him in possession of a silver handgun six days before the murder. According to Harris, the video constituted an extraneous act under Rule 404(b) of the Texas Rules of Evidence and, therefore, should have been excluded from evidence. *See* Tex. R. Evid. 404(b). Harris does not explain how the video constitutes an extraneous act or offense. However, for purposes of our analysis, we will assume, without deciding, that it does.

We review a trial court's admission of evidence of extraneous acts under an abuse of discretion standard. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). We must uphold the trial court's ruling if it is within the zone of reasonable disagreement. *Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002). Rule

17

404(b) of the Texas Rules of Evidence provides that evidence of a crime, wrong, or other act is not admissible to prove a person's character to show that the person acted in accordance with the character on a particular occasion, but it may be admissible for another purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. . . ." Tex. R. Evid. 404(b). The list of enumerated purposes for which an extraneous offense may be admissible under Rule 404(b) is neither exclusive nor exhaustive. *Montgomery*, 810 S.W.2d at 388. Evidence of extraneous acts may be admissible if it has relevance apart from its tendency to prove a person's character to show that he acted in conformity therewith. *Id.* at 387. However, the fact that evidence of extraneous acts is introduced for a purpose other than character conformity does not, standing alone, make the evidence admissible. *See Webb v. State*, 36 S.W.3d 164, 180 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). Proferred evidence must also be relevant to a fact of consequence in the case. *Id.* Evidence is relevant if it tends to make the existence of any fact of consequence more probable or less probable than it would be without the evidence. Tex. R. Evid. 401.

Rule 403 of the Texas Rules of Evidence provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the

jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "Rule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery*, 801 S.W.2d at 389. Once a trial court determines that evidence of extraneous acts is admissible under Rule 404(b), the trial court must, upon proper objection by the opponent of the evidence, weigh the probative value of the evidence against its potential for unfair prejudice. *Id.*; *see* Tex. R. Evid. 403.

> [A] Rule 403[] analysis must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006); *see also Erazo v. State*, 144 S.W.3d 487, 489 (Tex. Crim. App. 2004). However, if the only value of evidence of extraneous acts is to show character conformity, the balancing test required by Rule 403 is obviated because the "rulemakers hav[e] deemed that the probativeness of such evidence is so slight as to be 'substantially outweighed' by the danger of unfair prejudice *as a matter of law*." *Montgomery*, 810 S.W.2d at 387 (quoting *United States v. Beechum*, 582 F.2d 898, 910 (5th Cir. 1978)).

As discussed above, when defense counsel objected to the admission of the video under Rule 404(b), the trial judge ruled that the evidence was admissible under Rule 404, was relevant as "direct evidence toward the commission of the elements of the offense," and its probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, "or other considerations under Rule 403 and is admissible." The indictment alleged that Harris caused the victim's death by shooting him with a firearm. As discussed above, Brooks and Collins both testified that they heard gunfire while Harris was in the victim's garage, and that Harris had a small silver or chrome gun in his hand afterward. Moreover, both Brooks and Collins testified that the gun they saw in Harris's hand on the night of the murder appeared to be the same gun shown in the video. Hernandez testified that the ammunition rounds recovered at the scene were pistol rounds.

We conclude that the video was relevant to show that Harris had access to a gun that matched the witnesses' description of the murder weapon and comported with Hernandez's description of the ammunition recovered from the scene. *See* Tex. R. Evid. 404(b). We further conclude that the trial court appropriately performed the balancing test required by Rule 403. *See* Tex. R. Evid. 403; *Gigliobianco*, 210 S.W.3d at 641-42. The trial court did not err by determining that the evidence was

relevant beyond its tendency to show character conformity; did not tend to suggest making a decision on an improper basis or confuse or distract the jury; did not consume an inordinate amount of time; and was not cumulative. *See Gigliobianco*, 210 S.W.3d at 641-42. Accordingly, we overrule issue three.

## ISSUE FOUR

In issue four, Harris argues that the trial judge erred by overruling his objection to the State's cross-examination of Harris's mother, Tiffany Yeates. Specifically, Harris complains of the State attempting to challenge Yeates's testimony that Harris was at his girlfriend's house in Orange, Texas, on April 25th and 26th, and, therefore, could not have committed the murder in Beaumont. According to Harris, when Yeates testified that she always knew where Harris was, "[t]he State attempted to establish that she did not know where he was suggesting that he was at some apartments near Lamar University on April 14 and April 16 and was videoed with a gun on April 20." Harris contends that the State's question "suggested that [Harris] committed . . . extraneous acts of misconduct[,] and the State asked an improper question." Harris argues that "the prosecutor intended to subvert the Appellant's right to due process and fair trial" by suggesting that Harris might have committed crimes on other dates.

Yeates testified that Harris resides with her. When asked about April 25, 26, 27, and 28 of 2016, Yeates testified, "That time of the year is when for a fact I know [Harris] was at his girlfriend's house." According to Yeates, Harris's girlfriend resides in Orange, Texas, and Harris "stayed a few nights over there." Yeates explained, "I know he left Sunday night. He would go to her house on the weekends for sure. Every other weekend he would go out there and spend the weekend with her." Yeates testified that she did not immediately recall that Harris was in Orange on those dates, but Harris's girlfriend brought it to her attention by showing her a picture that had the date on it. Yeates testified that every time Harris would go to Orange, she always called his girlfriend's mother "to make sure he's actually there, that he arrived and made it safe because I wanted to make sure because [of] the traffic and all that."

During cross-examination, Yeates testified that Harris was at his girlfriend's house on the night of April 26, 2016, and that Harris had never owned a gun or had one in her house or his car. When shown the video of Harris, Yeates testified, "It looks like a gun." Yeates agreed that Harris was always at home with her or with an adult. The prosecutor later asked Yeates, "Were you aware that [Harris] was at some apartments around Lamar around April 14th and April 16th?" Defense counsel objected, and the parties approached the bench. During the bench conference,

22

defense counsel stated that he objected to "relevance" and asserted that the prosecutor was "trying to open up his own door." The trial judge overruled the objection, and Yeates then testified that she was not aware that Harris was around some apartments at Lamar University on April 14th and 16th.

As discussed above, Harris argues that the State's question during its cross-examination of Yeates "suggested that [Harris] committed . . . extraneous acts of misconduct[,] and the State asked an improper question." We review the trial court's admission of evidence for abuse of discretion. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles. *Hernandez v. State*, 53 S.W.3d 742, 750 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd). To preserve an appellate issue, the objection at trial must comport with the objection on appeal. *Ramirez v. State*, 815 S.W.2d 636, 645 (Tex. Crim. App. 1991).

At trial, defense counsel objected only to relevance. Therefore, Harris's appellate complaint that the State's question constituted an improper attempt to introduce an extraneous offense was not preserved for review. *See id*. To the extent that Harris's issue complains that the State's question was not relevant, we will address it. Yeates testified that Harris was always with her or another adult, and she always called Harris's girlfriend's mother when Harris visited Orange. Yeates also

23

testified that Harris was at his girlfriend's house in Orange on the date of the murder. As discussed above, evidence is relevant if it tends to make the existence of any fact of consequence more probable or less probable than it would be without the evidence. Tex. R. Evid. 401. In this case, Yeates's testimony during direct examination that Harris was not in Beaumont on the night of the murder made the issue of Yeates's veracity and reliability regarding her knowledge of Harris's whereabouts relevant. *See id*. As Harris acknowledges in his brief, his "defense depended on the credibility of his mother and girlfriend." The prosecutor was entitled to question Yeates regarding her testimony that Harris was in Orange on the night of the murder. *See id*. Therefore, the trial judge did not err by overruling Harris's relevancy objection. In addition, the record does not support Harris's contention that the prosecutor engaged in misconduct designed to subvert his right to due process and a fair trial, and Harris did not lodge an objection on that basis at trial. *See* Tex. R. App. 33.1(a). For all these reasons, we overrule issue four.

## ISSUE FIVE

In his fifth issue, Harris argues that he was denied due process when the State introduced evidence that he was in custody from the date of his arrest through trial. During cross-examination of his girlfriend, Aaliyah Keller, the State elicited testimony from Keller regarding a text message Harris sent to her on the day he was

24

arrested. Keller testified that on that date, Harris sent her a message that stated, "I'm fixing to go to prison[.]" The prosecutor also asked Keller whether she changed her name on Facebook and whether she and Harris began calling each other husband and wife on Facebook, and she stated that they did. The prosecutor then asked, "But still, he's locked up, right?" and "He's in jail, right?" Keller responded affirmatively to both questions, and defense counsel did not object.

As a prerequisite to raising a complaint on appeal, the record must show that the complaint was made to the trial court by a timely objection that stated the grounds of the objection with sufficient specificity to make the trial court aware of the complaint. Tex. R. App. P. 33.1(a)(1)(A). We conclude that Harris failed to preserve the issue for review. *See id*. However, even if Harris had preserved the issue, we cannot agree that the testimony indicated that Harris was in custody until the time of trial. At most, the testimony from Keller indicated that Harris was in custody when she changed her Facebook page. *See Pierce v. State*, 234 S.W.3d 265, 268 (Tex. App.—Waco 2007, pet. ref'd) (holding that trial court's instruction cured any prejudice caused by testimony revealing that the defendant was incarcerated); *see also generally Banks v. State*, 643 S.W.2d 129, 133 (Tex. Crim. App. 1982) (holding that the appellant's right to the presumption of innocence was not violated by deputies escorting him from the courtroom in the presence of prospective jurors).

25

Finally, we note that prior to the complained-of exchange between the prosecutor and Keller, defense counsel had elicited testimony from Yeates that Harris had been arrested and jailed. *See Nino v. State*, 223 S.W.3d 749, 754 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding that error in admission of testimony was harmless because similar testimony was admitted elsewhere). For all these reasons, we overrule issue five. Having overruled each of Harris's issues, we affirm the trial court's judgment.

     AFFIRMED.

 

_____
STEVE McKEITHEN
Chief Justice

Submitted on September 27, 2018
Opinion Delivered January 23, 2019
Do Not Publish

Before McKeithen, C.J., Kreger and Horton, JJ.